592 So.2d 271 (1991)
Rufus FORD, Appellant,
v.
STATE of Florida, Appellee.
No. 90-02227.
District Court of Appeal of Florida, Second District.
December 11, 1991.
Rehearing Denied January 8, 1992.
James Marion Moorman, Public Defender, and Stephen Krosschell, Asst. Public Defender, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Stephen A. Baker, Asst. Atty. Gen., Tampa, for appellee.
RYDER, Acting Chief Judge.

In all criminal prosecutions the accused shall ... have the right ... to confront at trial adverse witnesses... .
Fla. Const. art. I, § 16.
In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him... .
U.S. Const. amend. VI.
Rufus Ford seeks review of the trial court's judgment entered on a jury verdict finding him guilty of first degree murder. Ford raises three points on appeal, only one of which requires discussion for the disposition of this appeal. Because the videotaped testimony utilized herein was not statutorily authorized and violated Ford's constitutional rights, we reverse.
Ford married Sybil Ford on September 29, 1987. Tamara Alcendor, four years old at the time, was Sybil's natural daughter but not Ford's daughter. Ford and Sybil had a daughter, Jennifer. During the trial, a neighbor who lived six apartments away from the Fords, testified he was sitting on his front porch on the night of November 10, 1987, when he saw Ford drive to his house and park in the front yard. Sybil walked to the car and spoke to Ford, then returned to the house. Ford, with some *272 shopping bags, walked into the house shortly thereafter. The neighbor testified that Ford came out several minutes later, holding his head, crying, was very upset, and asked him to call the police.
When the paramedics arrived, followed later by the police, they saw Ford running around the front yard, hysterical and saying that his wife was dead. The two children were inside a car. The officers entered the house and found Sybil in a second floor bedroom dead of a gunshot wound. Sybil sat against the wall with her right arm on the night stand. The investigating officer saw gun powder in her mouth. Blood was splattered on the wall behind her body. Two officers separately talked with Ford outside of the house. He had no blood on his body or clothing. Corporal Queen testified that Ford told him that after he arrived he went inside and put some beer on a table. Ford heard a loud boom, went upstairs and saw Sybil lying on the floor. He went outside with one of the children and returned for the other child.
Two fingerprints were found on the shotgun, but one had no comparison value and the other did not match either Ford's or Sybil's prints. The medical examiner testified that the stippling pattern, the size of the wound, the gas lacerations and the burned gunpowder suggested a close range shot within a few inches but not contact inside the mouth or on the skin. Death occurred within a matter of seconds. The cause of death was a shotgun wound to the head, but the doctor was not sure of the manner of the death and deferred to the police to decide this point. It could have been either a suicide or a homicide.
On November 12, 1987, Ford voluntarily went to the police station with Tamara for a police interview. During the interview, Ford remarked he thought he had caught a venereal disease from his wife. He believed that she must have been having an affair with someone because he had not been with any other women. He stated that he did not touch or strike Sybil on the night she died, but they had argued about the stereo being too loud. The police also talked with Tamara separately who related to the officers that while she was playing with her younger sister on the bed, her mother took a shotgun from a shelf in the closet, stuck it in her mouth and pulled the trigger, firing the gun. Tamara also told the police that she wanted to live with Ford because he treated her well. She added that her mother had sometimes "come at" her "like a monster."
On November 12, 1987, the police asked the medical examiner to check Sybil's body for venereal disease. He found none. The police eventually decided that Sybil's death was a suicide. Their decision was based primarily on Tamara's statement. On November 13, 1987, the police informed the medical examiner that the manner of death was suicide.
In December 1988, different police officers reviewed the decision made a year earlier and reopened the investigation. On December 23, 1988, they again interviewed Tamara, this time they taped the interrogation. The tape revealed she first told them that she did not know what happened, but after further questioning through the use of leading questions and repetitive prodding by the police, she changed her story and stated that on the night in question, she was in bed with her sister, Jennifer, and her cousin, Crissy, watching television when Ford walked upstairs with Sybil. At the time, the Fords were arguing about which child was better and bigger. After further prodding by the police, Tamara stated that while they argued, Ford got a big gun from the closet. Tamara first said that Ford cut Sybil with Sybil's knife, but later again changed her story and said that Ford put a big gun (the shotgun) near Sybil's face and shot her two times, once in the nose and once in the leg, before putting the gun on the bed. Tamara said that Ford took Crissy, then herself and then Jennifer outside.
Later, Tamara was placed in foster care and a Dr. Kathryn Kuehnle began treating her in January 1989. The Guardian Ad Litem appointed for Tamara intervened and filed a motion for a protective order to require that all questions asked of Tamara at depositions be made by Dr. Kuehnle in *273 her office rather than by lawyers. At a hearing on May 1, 1989, Dr. Kuehnle testified that Tamara was an emotionally disturbed child due to the many traumatic events she had experienced. Dr. Kuehnle did not believe that Tamara was competent to testify in court at that time because she had given many inconsistent statements in the past about the case.
Dr. Kuehnle stated that Tamara had a good prognosis and might later become competent to testify. Dr. Kuehnle believed that Tamara would find the standard deposition setting to be very stressful and traumatic and would not give competent testimony. Under stress, Tamara was likely to say "yes" to almost any question. The deposition might also affect her ability to give competent testimony at future court hearings. Dr. Kuehnle testified that when young children are repeatedly questioned and answers are suggested to them, as here, they sometimes develop false learned memories which they later believe to be true. Dr. Kuehnle recommended that Tamara be interviewed in her office and that she be given a list of questions to ask, preferably with the attorneys watching the interview through a one-way mirror.
Dr. Melvyn Gardner, a psychiatrist, testified that in his opinion Tamara could be subjected to the usual deposition process without psychological injury. He had no evidence that she suffered from any mental illness. Dr. Gardner did not personally examine Tamara but based his opinion on the police reports, witness depositions and Dr. Kuehnle's testimony.
On May 2, 1989, the trial court denied the guardian's motion but strictly structured the ground rules governing the deposing of Tamara. The judge permitted the taking of the deposition in Dr. Kuehnle's office but required that each questioner ask as few questions as possible, and in a gentle, patient and nonaggressive manner. On May 12, 1989, the defense conducted a brief deposition of Tamara in which she stated that Ford shot Sybil, but the deposition quickly concluded after Tamara began saying repeatedly that she did not remember what had happened.
On September 29, 1989, the prosecutor moved, pursuant to section 92.55, Florida Statutes (1987), that Tamara's testimony be videotaped for trial. On October 3, 1989, the defense moved for a determination of her competency to testify. At hearings on October 11 and 12, 1989, Dr. Kuehnle testified that she had earlier given testimony in another case that Tamara was competent to give testimony. In that case, the defense videotaped Tamara's testimony and played it in court. Dr. Kuehnle believed that Tamara was still competent but would suffer moderate emotional or mental harm if she had to testify in court rather than by videotape. She stated that even though the last videotaping session had been conducted in a safe setting, Tamara afterwards became very disturbed at home. Dr. Kuehnle said that testifying in open court with a jury, judge, strangers and her stepfather present would be traumatic for Tamara. Dr. Kuehnle was aware of the many contradictory statements that Tamara had made to her and others. She believed, however, that Tamara was much more stable than she was on May 1, although she still had some ways to go.
Defense counsel renewed all motions and arguments. He argued that the state had no statutory authority to make the videotape and that Ford's right to confront the witnesses against him would be violated. Counsel argued that Tamara was not competent to testify because her statements were too inconsistent. The prosecutor responded that although Tamara was competent, the defense should be foreclosed from utilizing the normal discovery procedures in taking her deposition. The prosecutor urged the court to permit only Dr. Kuehnle to ask all of the questions, including any follow-up questions that counsel might have after hearing Tamara's initial answers. The trial judge reserved ruling on the competency question. The judge told counsel to submit their questions to him, ordered that the deposition would be taken on November 1 in Dr. Kuehnle's office, and stated that this action would help him determine Tamara's competency.
*274 On November 1, the trial judge, defense counsel, a prosecutor and Tamara met in Dr. Kuehnle's office. Dr. Kuehnle asked the questions. At first, Tamara frequently said she did not remember or know what happened. She then said that Sybil and Ford were fighting and that Ford took a gun from the shelf and shot Sybil. She denied telling the police earlier that Sybil shot herself. The court deferred ruling on the competency question until Dr. Krop, a defense expert, could examine Tamara.
Dr. Krop examined Tamara on March 26, 1990 while the trial judge and counsel for both sides were present. Dr. Krop found that Tamara responded to all questions posed and was comfortable with other parties present. He opined that she was a precocious child who had made considerable progress in therapy. She exhibited no evidence of a thought or adjustment disorder. Her memory, however, might be compromised due to the emotional impact of the events in question and the many times she had been interviewed. She could distinguish between truth and falsehood and could communicate well. Dr. Krop concluded that Tamara was competent to testify in open court. Although she would be uncomfortable and anxious about testifying in open court in the presence of her stepfather, Dr. Krop believed this experience would not be overly traumatic for her.
On April 5, 1990, the Guardian Ad Litem again filed a motion for a protective order requiring that Tamara's testimony be taken by videotape and not in open court. On April 11, the parties renewed their arguments on Tamara's competence. On April 13, Judge Griffin found that Tamara was competent to testify. Judge Griffin said he had been present at many interviews with the child and knew her well. He was particularly impressed when Dr. Krop asked whether she wanted to testify with her stepfather present. She had previously said that she was willing to testify in court but she evinced fear and apprehension when asked about her stepfather being present. The judge found that she would suffer moderate harm if required to testify in court. He orally granted the guardian's motion to videotape Tamara's testimony. The judge's findings were reduced to writing in an order filed April 18, 1990, in which he specified that each questioner would ask only simple questions and as few as possible in a "gentle, patient, and nonaggressive manner."
During trial, on Monday, April 23, the parties tried to interview Tamara on videotape in Dr. Kuehnle's office, but she would not talk despite many efforts to make her feel comfortable. After a lengthy session, she sucked her thumb, crawled into a fetal position, put her head on Dr. Kuehnle's leg, and then put her head on a defense counsel's leg.
On Wednesday, April 25, the parties again attempted to take Tamara's testimony, this time in Judge Griffin's office because Tamara had felt comfortable with him at other times. Although Judge Steinberg presided over the trial proper, Judge Griffin had handled most of the pretrial proceedings before he became ill. The video camera was hidden. Judge Griffin spoke to Tamara first and asked her to help out before he left and defense counsel entered. Tamara then stated that Ford and Sybil were arguing downstairs over which children they wanted. Tamara stated Ford pushed Sybil down the stairs and onto the kitchen stove, causing her arm to bleed. Thereafter, they fought over her purse. Tamara said that although she and her sister Jennifer were upstairs watching television, she went downstairs and peeked at them.
Tamara stated that Ford and Sybil then went upstairs to the bedroom, still arguing; that Ford took a gun and put bullets in it, but Sybil did not try to run away; that Sybil was scared; that Ford shot Sybil; and that he and the two children left the house and went into a car. Tamara said that Ford told her not to tell anyone what he had done. Tamara also stated she told the police what Ford had done. She denied telling them that Sybil killed herself. She also denied telling them that Sybil sometimes came at her like a monster. She further denied telling Dr. Kuehnle that Sybil had the gun and tried to shoot Ford.
*275 Dr. Kuehnle testified that Tamara had never previously said that Ford loaded the gun and never previously said that Ford pushed Sybil against the stove. Although Tamara had told Dr. Kuehnle that Ford shot Sybil, she also often said that Sybil got the gun first and shot herself. Dr. Kuehnle believed that the police asked Tamara leading questions in December 1988, which may have influenced her answers.
At this point, it is important to understand what this case involves and does not involve. This case does not involve child abuse or sexual abuse upon a child. This is a homicide case. Tamara is not a victim, she is a witness. The legislature restricted the procedures contained in sections 92.53 and 92.54, Florida Statutes (1989), to child abuse/sexual abuse victims or witnesses.
There is no statute or other authority which provides for the procedure used in this case to present the testimony of a witness to a homicide by videotape, contravening the accused's right to confrontation. The introduction of Tamara's videotaped testimony was not authorized and was, therefore, improper.
As opposed to sections 92.53 and 92.54, where the legislature acted, section 92.55 is a nonoperative statute as the legislature did not act. We decline the state's invitation to legislate, deferring to the body in whose province such action would be more properly addressed.
Even if we were to legislate and hold that the situation presented under the facts in this case were sufficient to treat Tamara similar to a child abuse/sexual abuse victim or witness, the procedures utilized here still failed to meet the requirements set forth in Maryland v. Craig, ___ U.S. ___, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), in order to preserve the defendant's right to confrontation.[1]Craig is a case concerning sexual abuse on a child and the use of closed circuit television for the child victim to testify.
The elements of confrontation which serve the purposes of the confrontation clause are set forth in Craig as physical presence, oath, cross-examination, and observation of demeanor by the trier of fact. 110 S.Ct. at 3163. Tamara was given no oath before giving the videotaped testimony. Because the camera was hidden, Tamara was not even aware that she was being taped. There also was no adequate cross-examination of Tamara in this case. The trial court so severely limited defense counsel's ability to cross-examine, it resulted, in fact, in no cross-examination at all. It resulted in questions and opportunity not even approaching the right to cross-examine in conformity with the right of confrontation. Tamara's testimony was not "subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony." Craig, 110 S.Ct. at 3166. Consequently, in this case, we are lacking both the elements of oath and cross-examination.
In addition, "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." Craig, 110 S.Ct. at 3166 (citations omitted) (emphasis supplied). Tamara was permitted to testify without any determination or satisfaction that she knew the importance of an oath and of telling the truth. There was no finding by the trial judge that Tamara's statements were trustworthy. As Tamara changed her story at least three times, and under extreme prodding by the police, grave concern about her trustworthiness should have surfaced.
Tamara first said that Sybil committed suicide. A year later, the police asked her strongly leading questions which may have influenced her answers and created false learned memories; a fear expressed by Dr. *276 Kuehnle in her testimony before the court. She told the police that two shots were fired, that Ford cut Sybil with a knife, and that her cousin Crissy was present. None of these statements could have been true. In therapy, she continued to tell Dr. Kuehnle different versions of the events including a version that Sybil shot herself first before Ford shot her. On the Monday of trial when she knew she was being videotaped, she refused to talk at all about her mother's death. Two days later when she did not know she was being videotaped, she gave a new version. A person's statements cannot be reliable if they are constantly changing. The reliability prong of the confrontation test was not met in this case.
"[T]hese other elements  oath, cross-examination, and observation of the witness' demeanor  adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony." Craig, 110 S.Ct. at 3166. The procedures used in securing Tamara's testimony not only were unauthorized, but they violated Ford's right to confront the witnesses against him.
In passing, we must comment upon another issue raised on appeal, and write as a guide during the retrial of this case. The introduction of the expert opinion testimony of Dr. Davis of which appellant complains is permissible and was not error.
The judgment appealed is reversed and the case is remanded for a new trial and for further proceedings consistent with this opinion.
HALL and PATTERSON, JJ., concur.
NOTES
[1] We do note, however, the recent case of Gonzales v. State, 818 S.W.2d 756 (Tex.Cr.App. 1991), wherein a Texas court held that legislation is not a prerequisite to taking a child's testimony out of the presence of a defendant. However, the Gonzales court went on to hold that the requirements set forth in Craig must still be met before allowing such testimony.