626 So.2d 1338 (1993)
STATE of Florida, Petitioner,
v.
Rufus FORD, Respondent.
No. 79220.
Supreme Court of Florida.
November 10, 1993.
*1340 Robert A. Butterworth, Atty. Gen., and Stephen A. Baker and Peggy A. Quince, Asst. Attys. Gen., Tampa, for petitioner.
James Marion Moorman, Public Defender, and Stephen Krosschell, Asst. Public Defender, Tenth Judicial Circuit, Bartow, for respondent.
HARDING, Justice.
We have for review Ford v. State, 592 So.2d 271 (Fla. 2d DCA 1991), which expressly construes the constitutional right to confrontation[1] and expressly conflicts with Hernandez v. State, 597 So.2d 408, 409 n. 2 (Fla. 3d DCA 1992). We have jurisdiction pursuant to article V, section 3(b)(3) of the Florida Constitution.
This case presents three issues: (1) whether a judge must have express statutory authority or a rule of court to employ a procedure that deviates from a defendant's right of face-to-face confrontation in a criminal trial, (2) whether the trial court's admission of a child witness's videotaped testimony in a homicide case violated the defendant's constitutional right to confrontation, and (3) if the admission of the child witness's videotaped testimony violated the defendant's right to confrontation, whether the defendant is entitled to a new trial.
First, we hold that absent appropriate authority[2] a trial court in a criminal case may employ a procedure if necessary to further an important public policy interest. In this case, though, the procedure employed was improper, and we find that the trial court erred in admitting the child witness's testimony by way of videotape. However, we disapprove the district court's holding *1341 that the improper admission of a child witness's testimony is an automatic basis for reversal.
Second, we hold that the videotaped testimony lacked sufficient indicia of reliability. Thus, the trial court should not have admitted the videotaped testimony.
Finally, we hold that the violation of the defendant's right to confrontation by admission of the videotaped testimony is subject to the harmless error analysis and that the error in this case was harmful. Therefore, we approve the reversal of the judgment and order the case remanded for a new trial.
We adopt the district court's rendition of the facts, which were set out as follows:
[Rufus] Ford married Sybil Ford on September 29, 1987. Tamara Alcendor, four years old at the time, was Sybil's natural daughter but not Ford's daughter. Ford and Sybil had a daughter, Jennifer. During the trial, a neighbor who lived six apartments away from the Fords, testified he was sitting on his front porch on the night of November 10, 1987, when he saw Ford drive to his house and park in the front yard. Sybil walked to the car and spoke to Ford, then returned to the house. Ford, with some shopping bags, walked into the house shortly thereafter. The neighbor testified that Ford came out several minutes later, holding his head, crying, was very upset, and asked him to call the police.
When the paramedics arrived, followed later by the police, they saw Ford running around the front yard, hysterical and saying that his wife was dead. The two children were inside a car. The officers entered the house and found Sybil in a second floor bedroom dead of a gunshot wound. Sybil sat against the wall with her right arm on the night stand. The investigating officer saw gun powder in her mouth. Blood was splattered on the wall behind her body. Two officers separately talked with Ford outside of the house. He had no blood on his body or clothing. Corporal Queen testified that Ford told him that after he arrived he went inside and put some beer on a table. Ford heard a loud boom, went upstairs and saw Sybil lying on the floor. He went outside with one of the children and returned for the other child.
Two fingerprints were found on the shotgun, but one had no comparison value and the other did not match either Ford's or Sybil's prints. The medical examiner testified that the stippling pattern, the size of the wound, the gas lacerations and the burned gunpowder suggested a close range shot within a few inches but not contact inside the mouth or on the skin. Death occurred within a matter of seconds. The cause of death was a shotgun wound to the head, but the doctor was not sure of the manner of the death and deferred to the police to decide this point. It could have been either a suicide or a homicide.
On November 12, 1987, Ford voluntarily went to the police station with Tamara for a police interview. During the interview, Ford remarked he thought he had caught a venereal disease from his wife. He believed that she must have been having an affair with someone because he had not been with any other women. He stated that he did not touch or strike Sybil on the night she died, but they had argued about the stereo being too loud. The police also talked with Tamara separately who related to the officers that while she was playing with her younger sister on the bed, her mother took a shotgun from a shelf in the closet, stuck it in her mouth and pulled the trigger, firing the gun. Tamara also told the police that she wanted to live with Ford because he treated her well. She added that her mother had sometimes "come at" her "like a monster."
On November 12, 1987, the police asked the medical examiner to check Sybil's body for venereal disease. He found none. The police eventually decided that Sybil death was a suicide. Their decision was based primarily on Tamara's statement. On November 13, 1987, the police informed the medical examiner that the manner of death was suicide.
In December 1988, different police officers reviewed the decision made a year earlier and reopened the investigation. On *1342 December 23, 1988, they again interviewed Tamara, this time they taped the interrogation. The tape revealed she first told them that she did not know what happened, but after further questioning through the use of leading questions and repetitive prodding by the police, she changed her story and stated that on the night in question, she was in bed with her sister, Jennifer, and her cousin, Crissy, watching television when Ford walked upstairs with Sybil. At the time, the Fords were arguing about which child was better and bigger. After further prodding by the police, Tamara stated that while they argued, Ford got a big gun from the closet. Tamara first said that Ford cut Sybil with Sybil's knife, but later again changed her story and said that Ford put a big gun (the shotgun) near Sybil's face and shot her two times, once in the nose and once in the leg, before putting the gun on the bed. Tamara said Ford took Crissy, then herself and then Jennifer outside.
Later, Tamara was placed in foster care and a Dr. Kathryn Kuehnle began treating her in January 1989. The Guardian Ad Litem appointed for Tamara intervened and filed a motion for a protective order to require that all questions asked of Tamara at depositions be made by Dr. Kuehnle in her office rather than by lawyers. At a hearing on May 1, 1989, Dr. Kuehnle testified that Tamara was an emotionally disturbed child due to the many traumatic events she had experienced. Dr. Kuehnle did not believe that Tamara was competent to testify in court at that time because she had given many inconsistent statements in the past about the case.
Dr. Kuehnle stated that Tamara had a good prognosis and might later become competent to testify. Dr. Kuehnle believed that Tamara would find the standard deposition setting to be very stressful and traumatic and would not give competent testimony. Under stress, Tamara was likely to say "yes" to almost any question. The deposition might also affect her ability to give competent testimony at future court hearings. Dr. Kuehnle testified that when young children are repeatedly questioned and answers are suggested to them, as here, they sometimes develop false learned memories which they later believe to be true. Dr. Kuehnle recommended that Tamara be interviewed in her office and that she be given a list of questions to ask, preferably with the attorneys watching the interview through a one-way mirror.
Dr. Melvyn Gardner, a psychiatrist, testified that in his opinion Tamara could be subjected to the usual deposition process without psychological injury. He had no evidence that she suffered from any mental illness. Dr. Gardner did not personally examine Tamara but based his opinion on the police reports, witness depositions and Dr. Kuehnle's testimony.
On May 2, 1989, the trial court denied the guardian's motion but strictly structured the ground rules governing the deposing of Tamara. The judge permitted the taking of the deposition in Dr. Kuehnle's office but required that each questioner ask as few questions as possible, and in a gentle, patient and nonaggressive manner. On May 12, 1989, the defense conducted a brief deposition of Tamara in which she stated that Ford shot Sybil, but the deposition quickly concluded after Tamara began saying repeatedly that she did not remember what had happened.
On September 29, 1989, the prosecutor moved, pursuant to section 92.55, Florida Statutes (1987), that Tamara's testimony be videotaped for trial. On October 3, 1989, the defense moved for a determination of her competency to testify. At hearings on October 11 and 12, 1989, Dr. Kuehnle testified that she had earlier given testimony in another case that Tamara was competent to give testimony. In that case, the defense videotaped Tamara's testimony and played it in court. Dr. Kuehnle believed that Tamara was still competent but would suffer moderate emotional or mental harm if she had to testify in court rather than by videotape. She stated that even though the last videotaping session had been conducted in a safe setting, Tamara afterwards became very disturbed at home. Dr. Kuehnle said that testifying in open court with a jury, judge, *1343 strangers and her stepfather present would be traumatic for Tamara. Dr. Kuehnle was aware of the many contradictory statements that Tamara had made to her and others. She believed, however, that Tamara was much more stable than she was on May 1, although she still had some ways to go.
Defense counsel renewed all motions and arguments. He argued that the state had no statutory authority to make the videotape and that Ford's right to confront the witnesses against him would be violated. Counsel argued that Tamara was not competent to testify because her statements were too inconsistent. The prosecutor responded that although Tamara was competent, the defense should be foreclosed from utilizing the normal discovery procedures in taking her deposition. The prosecutor urged the court to permit only Dr. Kuehnle to ask all of the questions, including any follow-up questions that counsel might have after hearing Tamara's initial answers. The trial judge reserved ruling on the competency question. The judge told counsel to submit their questions to him, ordered that the deposition would be taken on November 1 in Dr. Kuehnle's office, and stated that this action would help him determine Tamara's competency.
On November 1, the trial judge, defense counsel, a prosecutor and Tamara met in Dr. Kuehnle's office. Dr. Kuehnle asked the questions. At first, Tamara frequently said she did not remember or know what happened. She then said that Sybil and Ford were fighting and that Ford took a gun from the shelf and shot Sybil. She denied telling the police earlier that Sybil shot herself. The court deferred ruling on the competency question until Dr. Krop, a defense expert, could examine Tamara.
Dr. Krop examined Tamara on March 26, 1990 while the trial judge and counsel for both sides were present. Dr. Krop found that Tamara responded to all questions posed and was comfortable with other parties present. He opined that she was a precocious child who had made considerable progress in therapy. She exhibited no evidence of a thought or adjustment disorder. Her memory, however, might be compromised due to the emotional impact of the events in question and the many times she had been interviewed. She could distinguish between truth and falsehood and could communicate well. Dr. Krop concluded that Tamara was competent to testify in open court. Although she would be uncomfortable and anxious about testifying in open court in the presence of her stepfather, Dr. Krop believed this experience would not be overly traumatic for her.
On April 5, 1990, the Guardian Ad Litem again filed a motion for a protective order requiring that Tamara's testimony be taken by videotape and not in open court. On April 11, the parties renewed their arguments on Tamara's competence. On April 13, Judge Griffin found that Tamara was competent to testify. Judge Griffin said he had been present at many interviews with the child and knew her well. He was particularly impressed when Dr. Krop asked whether she wanted to testify with her stepfather present. She had previously said that she was willing to testify in court but she evinced fear and apprehension when asked about her stepfather being present. The judge found that she would suffer moderate harm if required to testify in court. He orally granted the guardian's motion to videotape Tamara's testimony. The judge's findings were reduced to writing in an order filed April 18, 1990, in which he specified that each questioner would ask only simple questions and as few as possible in a "gentle, patient, and non-aggressive manner."
During trial, on Monday, April 23, the parties tried to interview Tamara on videotape in Dr. Kuehnle's office, but she would not talk despite many efforts to make her feel comfortable. After a lengthy session, she sucked her thumb, crawled into a fetal position, put her head on Dr. Kuehnle's leg, and then put her head on a defense counsel's leg.
On Wednesday, April 25, the parties again attempted to take Tamara's testimony, this time in Judge Griffin's office because Tamara had felt comfortable with *1344 him at other times. Although Judge Steinberg presided over the trial proper, Judge Griffin had handled most of the pretrial proceedings before he became ill. The video camera was hidden. Judge Griffin spoke to Tamara first and asked her to help out before he left and defense counsel entered. Tamara then stated that Ford and Sybil were arguing downstairs over which children they wanted. Tamara stated Ford pushed Sybil down the stairs and onto the kitchen stove, causing her arm to bleed. Thereafter, they fought over her purse. Tamara said that although she and her sister Jennifer were upstairs watching television, she went downstairs and peeked at them.
Tamara stated that Ford and Sybil then went upstairs to the bedroom, still arguing; that Ford took a gun and put bullets in it, but Sybil did not try to run away; that Sybil was scared; that Ford shot Sybil; and that he and the two children left the house and went into a car. Tamara said that Ford told her not to tell anyone what he had done. Tamara also stated she told the police what Ford had done. She denied telling them that Sybil killed herself. She also denied telling them that Sybil sometimes came at her like a monster. She further denied telling Dr. Kuehnle that Sybil had the gun and tried to shoot Ford.
Dr. Kuehnle testified that Tamara had never previously said that Ford loaded the gun and never previously said that Ford pushed Sybil against the stove. Although Tamara had told Dr. Kuehnle that Ford shot Sybil, she also often said that Sybil got the gun first and shot herself. Dr. Kuehnle believed that the police asked Tamara leading questions in December 1988, which may have influenced her answers.
Ford, 592 So.2d at 271-75. The jury convicted Ford of first-degree murder, and the trial judge sentenced him to life imprisonment without possibility of parole for twenty-five years.
On appeal, the district court reversed the conviction and held that the trial court improperly admitted the child witness's videotaped testimony. The district court found that sections 92.53 and 92.54, Florida Statutes (1989), did not allow the trial court to admit the videotape of the child witness's testimony because the Legislature had restricted the procedures under those sections to cases involving child abuse and sexual abuse victims or witnesses. Id. at 275. The district court also held that section 92.55, Florida Statutes (1989), did not authorize the introduction of the child witness's videotaped testimony because the statute was nonoperative in that the Legislature did not establish procedures to present the videotaped testimony of a child who is a witness or victim in a criminal, civil, or juvenile proceeding. Id.
In addition, the district court held that even if section 92.55 authorized the videotaping of a child witness's testimony in a homicide case, the procedures used in the instant case violated the defendant's right to confrontation under Maryland v. Craig, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). Ford, 592 So.2d at 275. The district court found that the trial court's actions fell short of the Craig requirements because the child was not given an oath, defense counsel did not have adequate opportunity to cross-examine the child, and there was no finding that the child's statements were trustworthy. Id. Because of these shortcomings, the district court found that the trial court's procedures violated Ford's right to confront the witness against him.
In Hernandez the Third District Court of Appeal expressly disagreed with the Ford court's holding that the trial court erred in permitting the state to present the videotaped testimony of the child witness in the absence of an enabling statute or other authority and certified conflict on that issue. Hernandez, 597 So.2d at 409 n. 2. The Third District held that even without an enabling statute or rule, the trial court properly permitted two children who witnessed a murder to testify by way of closed-circuit television. Id. at 409. The court held that the testimony did not violate the defendant's right of face-to-face confrontation because it furthered the important public policy considerations of protecting the child witness from severe emotional harm and because there were sufficient *1345 indications that the testimony would be reliable. Id. at 409-10.
The first issue in the instant case is whether the trial court had the authority to employ a procedure not expressly authorized by law or by rule of court. We agree with the district court that sections 92.53 and 92.54 do not apply to the instant case because the Legislature has limited the procedures under those statutes to cases involving child abuse or sexual abuse. Further, we recognize that section 92.55 was nonoperative because there was no enabling action or Court rule that put the statute into effect.
However, the trial court's use of the unauthorized procedure in this case does not automatically entitle the defendant to a new trial.[3] A trial court may implement a procedure not expressly authorized by this Court or otherwise authorized by law if the procedure is necessary to further an important public policy interest. Cf. Ashley v. State, 265 So.2d 685, 692 (Fla. 1972) ("[T]o be a valid basis for a new trial it is incumbent upon a defendant to establish that [the procedure] denied him due process of law."). The policy reason in this case is the State's interest in protecting a child witness from the trauma of testifying in the presence of a defendant accused of killing her parent. We conclude that the trial court did not commit a per se reversible error by resorting to an unauthorized procedure to protect the child witness.
In addition, we note that the trial court had the inherent authority to act to protect the child witness. "All courts in Florida possess the inherent powers to do all things that are reasonable and necessary for the administration of justice within the scope of their jurisdiction, subject to valid existing laws and constitutional provisions." Roger A. Silver, The Inherent Power of the Florida Courts, 39 U.Miami L.Rev. 257, 263 (1985). A court's inherent powers include its ability to protect witnesses. See State ex rel. Gore Newspapers Co. v. Tyson, 313 So.2d 777, 782 (Fla. 4th DCA 1975), overruled on other grounds by English v. McCrary, 348 So.2d 293 (Fla. 1977). Thus, the trial court could have relied on its inherent powers to use an unauthorized procedure that would have protected the child witness in the instant case.
Turning to the second issue, however, we hold that the procedure the trial court employed in the instant case violated Ford's constitutional right to face-to-face confrontation under Craig, 497 U.S. 836, 110 S.Ct. 3157. A defendant's right to face-to-face confrontation is not absolute. The U.S. Supreme Court held in Craig that "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." Id. at 850, 110 S.Ct. at 3166. Despite the compelling policy reason to deviate from the defendant's right of confrontation in the instant case, we find that the procedure employed was improper and that the trial court erred in allowing the child witness to testify by way of videotape.
In determining whether an alternative procedure to a face-to-face confrontation was necessary to further an important public policy the Supreme Court held that:
[I]f the State makes an adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant.
Id. at 855, 110 S.Ct. at 3168. The finding of the necessity to take testimony by an alternative *1346 procedure must be case-specific to determine (1) whether the use of the alternative procedure is necessary to protect the welfare of the particular child and (2) whether the child witness would be traumatized by the presence of the defendant. Id. at 855-56, 110 S.Ct. at 3168-69.
The first determination is whether the use of the alternative procedure is necessary to protect the welfare of the child. Although the instant case is not a child abuse case, as Craig was, we find that the holding and rationale in Craig apply. The State has a traditional interest in protecting the emotional and mental welfare of children in child abuse and sexual abuse cases from the trauma of testifying in the defendant's presence. See Glendening v. State, 536 So.2d 212, 218 (Fla. 1988), cert. denied, 492 U.S. 907, 109 S.Ct. 3219, 106 L.Ed.2d 569 (1989). We find that the State has the same interest in protecting children who witness the violent death of a parent from the trauma of testifying in a defendant's presence. The trial court made a case-specific finding that the child witness would suffer "at the very least, moderate emotional or mental harm" if required to testify in the presence of the defendant.[4] The trial court based its finding on expert testimony and its own observations that the child witness had a negative reaction to the possibility of testifying in the presence of the defendant. Therefore, we find that the trial court showed the necessity of providing an alternative procedure in taking the child's testimony to the face-to-face confrontation with the defendant.[5]
The second question in applying Craig to the instant case is whether the child witness's videotaped testimony has sufficient indicia of reliability. The Supreme Court identified the elements that generally satisfy the reliability purpose of the Confrontation Clause: (1) the defense is given a full and fair opportunity to cross-examine a witness to probe and expose infirmities in the witness's testimony, such as forgetfulness, confusion, or evasion; (2) the witness testifies under oath; and (3) the trier of fact has the opportunity to examine the witness's demeanor as the witness testifies. Craig, 497 U.S. at 847, 110 S.Ct. at 3164.
First, we find the record shows that defense counsel had a full and fair opportunity to question the child witness about the facts surrounding Sybil's death and the child's prior inconsistent statements to the police and to Dr. Kuehnle. The record does not support the district court's conclusion that the trial court severely limited cross-examination to the point that it resulted in "no cross-examination at all." See Ford, 592 So.2d at 275. The trial court's written order required only that each questioner ask as few *1347 questions as possible in the interest of justice and that the questions be asked in a "gentle, patient and non-aggressive manner."[6] The Confrontation Clause guarantees only "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (per curiam). Moreover, the Supreme Court has stated that the trial judge retains a wide latitude "to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). We find that the trial court's written order placed reasonable limits that were necessary because of the child's emotional and mental maturity. We also find on the facts of this record that the examination conducted under these limitations provided Ford's counsel with a full and fair opportunity to question the child.
Although we find that the defendant had a full and fair opportunity to question the child witness, we nonetheless find that the reliability element of Craig was not satisfied. Craig also requires that the witness testify under oath. Children are not required to testify under oath in Florida,[7] but the trial court may allow a child to testify if the child understands "the duty to tell the truth or the duty not to lie." § 90.605(2), Fla. Stat. (1989). In the instant case, the child witness was not given an oath before giving her testimony, nor was there any inquiry to determine if the child knew the importance of telling the truth at the time of the videotaped testimony.
We recognize that on April 13, 1990, the trial court found the child competent to testify. Both Dr. Kuehnle and Dr. Krop, the defense expert, found the child competent to testify, so the record shows that the trial court did not abuse its discretion in finding the child competent. But the determination of the child's competency at one particular point in time is not enough to satisfy the reliability prong of Craig. The trial court's determination of the child's competency on April 13, 1990, did not remove the court's duty to inquire at the videotaping of the testimony on April 25, 1990, whether the child understood the duty to tell the truth or not to lie. As the United States Supreme Court noted in Kentucky v. Stincer, 482 U.S. 730, 740, 107 S.Ct. 2658, 2664, 96 L.Ed.2d 631 (1987), "the determination of competency is an ongoing one for the judge to make based on the witness's actual testimony at trial."
To allow a child to testify, a trial judge must find that the child "has sufficient intelligence to receive a just impression of the facts about which he or she is to testify and has sufficient capacity to relate them correctly, and appreciates the need to tell the truth." Lloyd v. State, 524 So.2d 396, 400 (Fla. 1988). Although the finding of competency on April 13, 1990, could indicate that the trial judge determined that the child understood her duty to tell the truth, the record indicates no such finding or determination. Because the determination of competency is ongoing, questions about the child's competency  and thus her recognition of the need to testify truthfully  should have arisen during an attempt to take the child's testimony on April 23, 1990. On that date, the child refused to talk about the incident, then sucked her thumb and crawled into a fetal position. On April 25, when the child testified on videotape, there was no determination that she remained competent to testify.
*1348 The importance of impressing on the child witness the "duty to tell the truth" is underscored by the child's many inconsistent statements about Sybil's death. The conflicting accounts the child witness gave about her mother's death made it incumbent on the trial judge to insure that the child witness knew she had a duty to tell the truth. The child first told the police in November 1987 that Sybil committed suicide. When police reopened the investigation in December 1988, the child responded to police investigators' prodding and leading questions by saying that Ford shot Sybil twice and that Ford cut Sybil with a knife. The physical evidence did not support what the child told the police. Dr. Kuehnle testified that in therapy the child continued to tell different versions of the events. In addition, the child gave conflicting reports or was unable to respond at all when she was questioned in judicial proceedings. On the first attempt to videotape the child's testimony during the trial, the child crawled into a fetal position and sucked her thumb. Two days later, the child testified on videotape that Ford pushed Sybil down the stairs and against the stove. She further testified that Ford followed Sybil upstairs, loaded the shotgun, and shot Sybil. Dr. Kuehnle testified that the child had not previously stated the details of Ford pushing Sybil down the stairs and against the stove or of Ford loading the gun. The result of the child witness's changing versions of Sybil's death without the trial court impressing on the child the importance of telling the truth and without a proper determination of the child's competency to testify is that the videotaped testimony is not reliable. Thus, the reliability prong of Craig is not satisfied.
A third indicator of reliability addressed in Craig is whether the trier of fact has the opportunity to examine the witness's demeanor as the witness testifies. We find it unnecessary to address this issue. The problems with the reliability of the child's testimony are so serious that the fact that the jury had the opportunity to observe the child's demeanor on the videotape would not change the analysis of the child's understanding of the need to tell the truth.
The third issue we address is whether the admission of the child's videotaped testimony, which violated Ford's right to confrontation, entitles Ford to a new trial. In State v. Clark, 614 So.2d 453 (Fla. 1992), this Court held that an appellate court may apply the harmless error analysis where a defendant's right to confrontation was violated by the improper admission of a discovery deposition in a criminal trial. Id. Similarly, the harmless error analysis can be applied in the instant case. The harmless error test in Florida places
the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.
State v. DiGuilio, 491 So.2d 1129, 1135 (Fla. 1986).
Determining whether the admission of the videotaped testimony is harmless depends on a number of factors, including
"the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."
Clark, 614 So.2d at 454-55 (quoting Van Arsdall, 475 U.S. at 684, 106 S.Ct. at 1438). Examining the entire record and the content of the child's videotaped testimony, we find that the child's testimony was key to obtaining the conviction. The child was presented by the State as the only eyewitness to Sybil's death. In addition, the record shows that expert witnesses differed on whether the physical evidence demonstrated a suicide or homicide. Thus, the State did not meet its burden that "there is no reasonable possibility that the error contributed to the conviction." DiGuilio, 491 So.2d at 1135. Ford, therefore, is entitled to a new trial.
Accordingly, we approve the holding in the decision below and in Hernandez to the extent that it is consistent with this opinion. *1349 The district court's judgment of reversal is approved with directions that the case be remanded for a new trial.
It is so ordered.
BARKETT, C.J., and OVERTON, McDONALD, SHAW, GRIMES and KOGAN, JJ., concur.
NOTES
[1] U.S. Const. amend. VI, and art. I, § 16, Fla. Const.
[2] We do not reach the issue of the Legislature's power to implement these court procedures under the separation of powers doctrine. Art. II, § 3, Fla. Const.
[3] This Court has not considered the issue of the presentation of a child witness or victim's testimony by way of videotape or closed-circuit television, except in the context of sections 92.53 and 92.54, Florida Statutes (1989). Consequently, we recommend that the Juvenile Court Rules Committee and the Criminal Procedure Rules Committee consider the issue raised by Ford v. State, 592 So.2d 271 (Fla. 2d DCA 1991), and Hernandez v. State, 597 So.2d 408 (Fla. 3d DCA 1992), and that the committees propose a rule that would allow for the protection of children and at the same time protect the right to confrontation as outlined by the United States Supreme Court in Maryland v. Craig, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990).
[4] The trial court's order dated April 17, 1990, states in pertinent part:

2. In addition to the testimony of Dr. Kathryn Kuehnle, who has provided therapy for "the Child" since early 1989, the Court has personally observed "the Child's" negative reaction to questions proposed to her regarding the possibility of her testifying in open Court in the presence of the Defendant.
The Court finds that there is a strong possibility that "the Child" might even be unable to testify if required to do so in open Court.
3. That to require "the Child" to testify in open Court would cause, at the very least, moderate emotional or mental harm, and in this Court's opinion, there is a strong possibility that such an "open Court" testimony requirement could possibly cause severe emotional harm to "the Child."
4. That the Defendant's right to confront the witness ("the Child") must give way to the stronger public policy of protecting the mental and emotional sensibilities of a child of such tender years.
We are concerned with the trial judge's lack of specificity in this order, particularly where the court found a "strong possibility" that face-to-face confrontation "could possibly cause" severe emotional harm. Trial courts should make their findings as specific as possible.
[5] The Supreme Court declined to set a minimum threshold for showing of an emotional trauma to the child. The Court stated that "the trial court must find that the emotional distress suffered by the child witness in the presence of the defendant is more than de minimis, i.e., more than `mere nervousness or excitement or some reluctance to testify.'" Craig, 497 U.S. at 856, 110 S.Ct. at 3169 (quoting Wildermuth v. State, 310 Md. 496, 530 A.2d 275, 289 (1987)). We conclude that the trial court met the threshold because the trial found more than a de minimis showing of trauma if the child was required to testify in the presence of the defendant. See Myles v. State, 602 So.2d 1278, 1281 n. 4 (Fla. 1992) ("Moderate harm would satisfy the `more than de minimus' requirement of Craig.").
[6] The trial court's order dated April 18, 1990, stated in pertinent part:

d. Each questioner shall ask as few questions as possible, such questioning to be as simple, relevant, and to the issues of this case as is possible, in the interest of justice.
e. Questions are to be asked in a gentle, patient, and non-aggressive manner, recognizing the tender years of the child.
f. Appropriate recesses are to be taken at intervals appropriate to children of tender years, as suggested by Dr. Kuehnle.
[7] Section 90.605(2), Florida Statutes (1989), reads as follows:

(2) In the court's discretion, a child may testify without taking the oath if the court determines the child understands the duty to tell the truth or the duty not to lie.