Rural **HICKS–BEY**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 91–CF–644.

District of Columbia Court of Appeals.

Argued Nov. 17, 1992.

Decided Nov. 7, 1994.

Stephen O. Russell, Oxon Hill, MD, for appellant.

Ann K.H. Simon, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, and John R. Fisher, Roy W. McLeese, III, and Julieanne Himelstein, Asst. U.S. Attys., were on the briefs, for appellee.*

Before FERREN,** TERRY, and SULLIVAN, Associate Judges.

Opinion for the court PER CURIAM.

Opinion by Associate Judge SULLIVAN, concurring in part and dissenting in part at page 576.

---

* After oral argument, this court ordered that supplemental briefs be filed. The appellee's supplemental brief was filed February 8, 1993, the appellant's brief was filed October 4, 1993, and the reply brief of appellee was filed October 18, 1993.

** Former *Chief Judge* ROGERS was a member of the division that heard oral argument in this

PER CURIAM.

Appellant, Rural Hicks–Bey, seeks reversal of his conviction for carnal knowledge, D.C.Code § 22–2801, on the ground that the trial judge violated his Sixth Amendment right to face-to-face confrontation with the minor victim by permitting the minor to testify at trial over closed-circuit television. Specifically, appellant contends that, in the absence of enabling legislation authorizing the use of closed-circuit testimony for minor victims, the trial judge lacked the authority to employ that kind of procedure; the witness's removal from the courtroom to testify over closed-circuit television violated appellant's Sixth Amendment right of confrontation; and, in any event, the trial judge failed to make a specific finding of "necessity" required to invoke the television procedure. Appellant also urges reversal on the ground that the evidence the government presented at trial was insufficient to support his conviction for carnal knowledge.

We conclude that, even in the absence of local enabling legislation, the trial judge's ruling met the requirements specified by *Coy v. Iowa,* 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), and *Maryland v. Craig,* 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). Accordingly, we affirm.

## I. Proceedings

### A. The Competency Hearing

A grand jury indicted appellant on one count of carnal knowledge, D.C.Code § 22–2801, and one count of taking indecent liberties with a minor child, *id.* § 22–3501,[1] arising from an assault on his then six-year-old stepdaughter, O.H.B.[2]

The court held a hearing to determine whether O.H.B. was competent to testify. During the hearing, the child testified that she recalled being home alone with "Ed-

case. After her departure from the court, *Judge* FERREN was selected by lot to replace her.

1. The trial judge dismissed the indecent liberties count at the close of the government's case.

2. In an effort to protect the identity of the minor, we shall refer to her by her initials.

mond"[3] on the "night when she was given some beer." . She testified that "something bad" had happened that night and that appellant "did it" to her. Initially, however, she declined to describe the incident for the court, saying only that she was scared to testify and scared of appellant. At that time, the prosecutor requested that the remainder of the child's testimony be taken out of appellant's physical presence. Despite defense counsel's strenuous objection that the procedure violated his client's confrontation right, the trial judge granted the prosecutor's request.[4] To support his ruling, the trial judge made the following specific factual findings about the child's behavior at the hearing:

1. She was quite disturbed;

2. She was terrified to testify;

3. At one point, she was so frightened that she attempted to hide under the witness stand; and

4. Her fear was due to appellant's presence in the courtroom.

When the competency hearing resumed, appellant was placed in a witness room separated from the courtroom by a one-way mirror from which he viewed and heard the proceedings. The child then resumed the witness stand. She testified that on the night when appellant had given her beer, which she had drunk, she and appellant had been in her mother's room, on the bed. No one else had been in the room. Appellant had disrobed O.H.B. and had removed his own clothing in her presence. She then testified that "[appellant had] put his privates in [her] privacy." On the basis of this testimony, the trial judge found her competent to testify.[5]

## B. *Before Trial*

Before trial, the prosecutor requested that O.H.B.'s trial testimony be taken out of ap-

pellant's physical presence. Specifically, the prosecutor proposed that O.H.B. be placed in the jury room and her live testimony shown over closed-circuit television to appellant, his counsel, and the jury. Appellant's counsel objected, stating that it was "an abridgement of [his] client's right of confrontation if the [c]ourt allows anything other than having the complaining witness present in this courtroom and present before [his] client."

The trial judge recognized that the prosecutor's request raised a novel issue in this jurisdiction. After hearing arguments from both the government and defense counsel, the trial judge agreed with the government that *Maryland v. Craig, supra,* controlled, and thus the judge undertook an inquiry to determine whether the closed-circuit television procedure was necessary on the facts of this case. In concluding that such a procedure was necessary to protect O.H.B.'s welfare, the trial judge made the following findings:

1. [T]he child witness would be traumatized by the presence of the Defendant and the emotional distress suffered by the child in the presence of the Defendant is more than de minimis;

2. [A]t the time of the initial hearing in the presence of the Defendant, the witness was withdrawn and hesitant and slow in answering. She hid her face with her hands over the microphone in this instance and she actually sank down in the witness chair and disappeared under the bench in front of the witness chair;

3. [W]hen the Defendant was removed and placed behind the one or two-way glass panel ... in the second phase of the competency hearing, the witness did testify and she testified she was afraid of Edmond ... the Defendant.

---

3. Edmond is appellant's middle name, the name by which the child knew him.

4. The trial judge ruled that a competency hearing does not rise to the level of a trial proceeding and that the right of confrontation is not as strict as it would be in a trial situation. *See Kentucky v. Stincer,* 482 U.S. 730, 739–44, 107 S.Ct. 2658, 2664–67, 96 L.Ed.2d 631 (1987) (confrontation right not violated by exclusion of defendant from competency hearing of child witnesses, where

defendant had opportunity for full and effective cross-examination at trial). That ruling is not challenged on appeal.

5. The trial judge found that O.H.B. had the capacity to distinguish truth from falsehood and to appreciate the importance of telling the truth. Moreover, the judge found that O.H.B. demonstrated an ability to recollect.

4. So, therefore, to protect the child witness from the trauma of testifying in the physical presence of the Defendant, which trauma I fear would interfere with the witness' ability to communicate, I think that the use of the t.v. procedure is warranted in this case.

The judge gave appellant three options to choose from regarding the manner in which the television procedure would be conducted.[6] Although preserving his objection to any of these procedures on Sixth Amendment grounds, appellant chose the option which allowed him to be present in the courtroom with the judge and jury, while the child, the prosecutor, and defense counsel were in the adjacent jury room. Defense counsel had unrestricted access both to the judge, in order to obtain rulings on any objections counsel might have, and to appellant, in order to consult. Appellant also had unrestricted access to his attorney.

## C. *The Government's Evidence at Trial*

Pediatrician Karen J. Narkewicz was the first government witness. She testified concerning her examination of O.H.B. at Children's Hospital. In her opinion, the child had been the victim of recent sexual abuse. Dr. Narkewicz diagnosed O.H.B. as suffering, on the night of the assault, from severe genital trauma secondary to sexual abuse and from ethanol intoxication. Her opinion was predicated upon the following medical findings: O.H.B. had arrived at the hospital very disheveled and dirty and smelled of alcohol. Vomitus had been caked on her mouth, and her pants had remained down. Although O.H.B.'s eyes had been open, she had been unresponsive and had had difficulty walking. A blood test had revealed a blood-alcohol level of .219. The legal level of intoxication in the District of Columbia is .10. The Poison Control Center advised that, to have had that blood alcohol level, O.H.B. would have had to drink two 12–ounce cans of beer within the previous six hours. The child had told a doctor that appellant had given her one and a half beers to drink.

Dr. Narkewicz also testified that further physical examination revealed that the child's panties had been stained with "sanguinous fluid," a clear fluid, probably her own vaginal mucosa or, possibly, semen, tinged with blood. There had been a bloody discharge on her perineum, plus one hair.[7] The child's vulva had been very red and irritated, but not torn. Her hymenal opening had measured five by five millimeters, as compared with a normal hymenal opening for a six-year-old of five by one to two millimeters, and there had been no visible hymenal ring left. In Dr. Narkewicz's opinion, the child's condition had been consistent with a man recently having placed his penis into her vagina.

Next, O.H.B.'s sister, T.H.B., testified that on the night of the assault on her sister, she and appellant's wife (T.H.B.'s mother), along with appellant's girlfriend, had left the apartment to visit a friend. When they had returned several hours later, T.H.B. had found her sister lying face-down on her own bed and nude, except for her underpants, which had been pulled down to her knees. T.H.B. had alerted her mother to O.H.B.'s condition, and their mother had begun to argue with appellant, who was present in the apartment. T.H.B. and her mother then had gone outside

6. The options were: (1) the child could be present in the courtroom with the judge, jury, prosecutor, and defense counsel, while appellant observed and heard the proceedings from a witness room located behind the courtroom, which is separated by a one-way mirror; (2) appellant could be present in the courtroom with the judge, jury, and defense counsel, while the child and the prosecutor were in the adjacent jury room, visible and audible on simulcast, closed-circuit television through monitors located in the courtroom; or (3) appellant could be present in the courtroom with the judge and jury, while the child, the prosecutor, and defense counsel were in the adjacent jury room. Under each option, defense counsel would enjoy unrestricted access both to the judge, in order to obtain rulings on any objection he.might have, and to appellant, in order to consult. Appellant also would enjoy unrestricted access to defense counsel. Further, if defense counsel had elected option two, the available technology would have permitted him to cross-examine the child from the courtroom.

7. Robert Fram, an FBI hair and fiber expert, testified for the government that the hair was too fine for meaningful comparison but was dark brown African–American fringe head hair.

to summon assistance, as they had no telephone. They had flagged down Metropolitan Police Officer Pedro A. Garcia.

Officer Garcia testified that T.H.B. and her mother had been hysterical and that the mother had said her husband had just sexually abused her daughter. According to Officer Garcia, the mother had insisted that he accompany them to her apartment, where the officer had seen appellant, completely nude, walking from the bathroom to the bedroom. Officer Garcia had gone into O.H.B.'s bedroom and had found her lying face-down on the bed, nude from the waist down, and unconscious. There had been a wet spot on the bed where the child had been lying, and the room was littered with beer cans. Garcia had asked appellant if he had been in the apartment the whole time, and appellant had replied in the affirmative.

Metropolitan Police Officer Milagros Morales testified that she had attempted to interview O.H.B. on three occasions. On the first occasion, the child had been unconscious at the hospital. On the second occasion, at her home two weeks later, O.H.B. had been withdrawn and not very talkative. The third meeting took place approximately several months later at the prosecutor's office. On that occasion, the child had told Officer Morales that she remembered the night when she had been at home with appellant. She said that appellant had given her some beer that night. Then, he had "laid her down on the bed, got on top of her and placed his privacy in her privacy." In response to Morales' further questioning, O.H.B. had pointed to her vaginal area to show where her "privacy" was located, and, using an anatomically correct male doll, had pointed to the doll's penis to show where a man's privacy was located. Then using the dolls, O.H.B. had demonstrated what appellant had done to her. Officer Morales further testified:

> [T]he first thing that she did was she pulled down the pants of the male doll.

She then laid the female doll down and pulled down her panties. At that time she took the male doll and placed the male doll on top of the female doll making sure that the genital area had contact.

Finally, despite the closed-circuit television procedure, O.H.B. was unable to testify about what happened to her on the night she had been left at home alone with appellant. She could only testify that she had been at home with appellant in her mother's bedroom watching television on the night of the assault.

### D. *The Defense Evidence at Trial*

Appellant's sole witness was O.H.B.'s mother. She confirmed most of the evidence offered by the government witnesses regarding the events leading up to and following the crime. However, she testified that when she, T.H.B., and appellant's girlfriend had returned to the apartment after visiting the friend, appellant was not at home. She testified that she blamed the assault on her child on her husband because he would not help her find the person who abused the child.

## II. TESTIMONY BY CHILD ABUSE VICTIMS OVER CLOSED-CIRCUIT TELEVISION IN THE ABSENCE OF ENABLING LEGISLATION

■ Appellant challenges the trial court's authority to permit a child abuse victim to testify at trial over closed-circuit television, out of the presence of the defendant and the judge. He contends that, in the absence of a District of Columbia statute authorizing such testimony, the Sixth Amendment takes precedence, meaning that he was entitled to direct confrontation in court by the complaining child victim in this case.

It is true that many jurisdictions in the United States have statutes authorizing the use of closed-circuit television for adducing the testimony of victims of child abuse.[8] In *Craig*, the Supreme Court held that Mary-

---

8. According to the Supreme Court, as of four years ago, "[t]hirty-seven States ... permit[ted] the use of videotaped testimony of sexually abused children; 24 States have authorized the use of one-way closed-circuit television testimony in child abuse cases; and 8 States [have] authorize[d] the use of a two-way system in which the child-witness is permitted to see the courtroom and the defendant on a video monitor and in which the jury and judge are permitted to view the child during the testimony." *Craig,* 497 U.S. at 853–54, 110 S.Ct. at 3167–68 (footnotes omitted).

land's statutory procedure allowing the use of one-way closed-circuit television for this purpose [9]—when coupled with other safeguards—did not violate the Sixth Amendment's Confrontation Clause. *See Craig,* 497 U.S. at 860, 110 S.Ct. at 3171.[10] Specifically, *Craig* approved the use of closed-circuit television for testimony by child abuse victims if the state demonstrates its "necessity":

> [I]f the State makes an *adequate showing of necessity,* the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant.

*Id.* at 855, 110 S.Ct. at 3169 (emphasis added). The demonstration of "necessity" requires three trial court findings specific to the case:

> [1] [T]he trial court must hear evidence and determine whether use of the one-way closed-circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify. [2] The trial court must also find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant.... [3] Finally, the trial court must find that the emotional distress suffered by the child witness in the pres-

ence of the defendant is more than *de minimis, i.e.,* more than "mere nervousness or excitement or some reluctance to testify."

*Id.* at 855–56, 110 S.Ct. at 3168–69 (citations omitted).

In the District of Columbia, unlike in Maryland, there is no statute authorizing the trial court to permit a victim of child abuse to testify over closed-circuit television. Thus, in this jurisdiction, unlike in *Craig,* the legislature has not articulated a public policy and procedures to govern the testimony of child abuse victims at criminal trials.

Faced with the government's request that O.H.B.'s testimony be taken over closed-circuit television, and aware of the absence of a relevant local statute, the trial judge examined *Craig* and concluded that such a statute was not a prerequisite to constitutionality of the proposed procedure. More specifically, the trial judge concluded that, if he made the required finding of necessity applying *Craig's* criteria to the particular facts of this case, the child-victim could testify at the trial over closed-circuit television, without face-to-face confrontation of appellant.

■ Appellant contends that the trial judge had no authority to employ the procedure approved in *Craig* because of the lack of enabling legislation in the District of Colum-

---

**9.** *See* MD.CODE ANN., CTS. & JUD.PROC. § 9–102 (1989).

**10.** In *Coy v. Iowa, supra,* a screen had prevented two child witnesses from seeing the defendant as they testified against him at trial. The Supreme Court held that this procedure violated the defendant's rights under the Confrontation Clause. The Court "le[ft] for another day ... the question whether any exceptions exist" to the "irreducible literal meaning of the Clause: 'a right to *meet face to face* all those who appear and give evidence at trial.'" *Id.,* 487 U.S. at 1021, 108 S.Ct. at 2803 (citations omitted). The Court added that any exception "would surely be allowed only when necessary to further an important public policy," *id.,* and that "[s]ince there ha[d] been no individualized findings that these particular witnesses needed special protection, the judgment [in *Coy*] could not be sustained by any conceivable exception." *Id.*

Two years later in *Craig,* the Court said: "Because the trial court in this case made individualized findings that each of the child witnesses needed special protection, this case requires us

to decide the question reserved in *Coy.*" *Craig,* 497 U.S. at 845, 110 S.Ct. at 3163. *Craig* then noted that "[t]he central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Id.* The Court stressed that the Confrontation Clause guarantees the defendant the right not only to the physical presence of the adverse witness in court but also to three other indicia of reliability: the witness's statements under oath, the witness's testimony subject to cross-examination, and the witness's demeanor observable by the jury. *See id.* at 845–46, 110 S.Ct. at 3163–64.

In arguing against the closed-circuit television procedure used at trial, appellant does not contend that the "reliability" criteria are not met; his only focus is on the second—and most significant—question in *Craig:* whether there has been "an adequate showing of necessity," *id.* at 855, 110 S.Ct. at 3169, for that procedure. Thus, we focus exclusively on the "necessity" issue.

bia. We cannot agree. *Craig*'s approval of closed-circuit television procedures based upon "an adequate showing of necessity," *id.* at 855, 110 S.Ct. at 3169, is not premised on the existence of a state enabling statute. *See Gonzales v. State,* 818 S.W.2d 756, 766 (Tex. Crim.App.1991) (en banc), *cert. denied,* —— U.S. ——, 113 S.Ct. 1334, 122 L.Ed.2d 718 (1993) ("we do not read *Coy* [11] or *Craig* as mandating some sort of enabling statute for the trial court's actions"). Rather, the Supreme Court in *Craig* cited the Maryland statute only for the purpose of demonstrating that compliance with the statute, on the facts of that case, evidenced satisfaction of the third type of finding required for a showing of "necessity." The Court was clear; it

> need not decide the minimum showing of emotional trauma required for use of the special procedure ... because the Maryland statute, which requires a determination that the child witness will suffer "serious emotional stress such that the child cannot reasonably communicate," § 9-102(a)(1)(ii), clearly suffices to meet constitutional standards.

*Craig,* 497 U.S. at 856, 110 S.Ct. at 3169. The Court did not say, or imply in any way, that, in evidencing satisfaction of the third required finding, the statute was *necessary* to that finding. Presumably, even in the absence of a statute, evidence can suffice to show that third finding ("the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis,*" *id.* at 856, 110 S.Ct. at 3169), just as other evidence can satisfy the first two required findings. The fact that *Craig* included two constitutional criteria, requiring specific trial court findings that the Maryland statute did not expressly address, helps make clear that *Craig*'s constitutional criteria do not depend on the existence of a state statute.

In sum, there is no hint in *Craig* that, to satisfy the Confrontation Clause, a court cannot permit a closed circuit television procedure for a child witness in the absence of an authorizing statute. All that is required is trial court findings reflecting compliance with the three "necessity" criteria specified in

*Craig* (quoted above). *See State v. Ford,* 626 So.2d 1338, 1340, 1345–47 (Fla.1993) (approving closed circuit television testimony of child witness in murder case without *Craig*-type statute; "absent appropriate authority[,] a trial court in a criminal case may employ a procedure if necessary to further an important public policy interest"); *Gonzales,* 818 S.W.2d at 763–66 (same). *But see Hochheiser v. Superior Court,* 161 Cal.App.3d 777, 208 Cal.Rptr. 273, 276 (1984) (pre-*Craig* decision holding that closed-circuit television of child witness's testimony represented "far-reaching innovation in a criminal trial more appropriately left to the Legislature for initial consideration"). In the present case, the trial court made comprehensive findings, quoted above, which clearly satisfy all the *Craig* criteria.

■ Courtroom procedures for the most part are dictated by statute and court rules, as well as by constitutional requirements; but, in addition, the trial court has inherent authority, unless otherwise specifically precluded, to control the conduct of the proceedings before it, in order to ensure that the proper decorum and appropriate atmosphere are established, that all parties are treated fairly, and that justice is done. *See Guaranty Dev. Co. v. Liberstein,* 83 A.2d 669, 671 (D.C.1951) ("[i]t is a well settled rule that the mode of conducting trials ... [is a] matter[ ] belonging very largely to the practice of the court"); 75 Am.Jur.2d *Trial* § 180 (1991). Indeed, innovative trial procedures are acceptable as long as they "are administered carefully and meet the requirements of due process." *United States v. Lewis,* 230 U.S.App.D.C. 212, 219, 716 F.2d 16, 23, *cert. denied,* 464 U.S. 996, 104 S.Ct. 492, 78 L.Ed.2d 686 (1983) (sustaining trial of several criminal cases simultaneously before two juries absent evidence indicating dual jury caused specific prejudice to a defendant).

In the present case, as indicated, the trial court, in affording the protections required by *Coy, supra* note 10, and by *Craig,* satisfied appellant's rights under the Confrontation Clause. Appellant, moreover, does not claim a violation of due process.

11. See *supra* note 10.

### III. SUFFICIENCY OF THE EVIDENCE:

Finally, we hold that the evidence, viewed as it must be in the light most favorable to the government, *Nelson v. United States,* 601 A.2d 582, 593 (D.C.1991), was sufficient to sustain appellant's conviction. Although O.H.B. herself was unable to testify about what happened to her on the night she was left at home with appellant, the lack of testimony from the victim was not fatal to the government's case. *See, e.g., Riley v. United States,* 291 A.2d 190, 193 (D.C.1972) (circumstantial evidence sufficient to support conviction of assault and larceny even though victim did not testify at trial). The combined testimony of O.H.B.'s mother and sister, Officer Garcia, Officer Morales, and Dr. Narkewicz, together with the records of O.H.B.'s medical examination and the laboratory tests, was plainly sufficient to establish that appellant had committed the crime of which he was convicted. *See In re W.E.P.,* 318 A.2d 286, 288–89 (D.C.1974); *see also Ballard v. United States,* 430 A.2d 483, 487 (D.C.1981) (carnal knowledge instruction was properly given because evidence was sufficient to support it). There is no denying that Officer Morales' testimony was hearsay. But it elicited no objection from defense counsel, and thus it could be "properly considered by the trier of fact and given its full probative value." *Eldridge v. United States,* 492 A.2d 879, 883 (D.C.1985) (citing cases).

*Affirmed.*

SULLIVAN, Associate Judge, concurring in part and dissenting in part:

Although I concur in the judgment of my colleagues affirming appellant's conviction, I disagree with the route they took to reach their conclusion. Appellant contends that in the absence of a statute enacted by the District of Columbia authorizing the use of closed-circuit television testimony of minor victims, the Sixth Amendment takes precedence, and therefore, he was entitled to be confronted by the complaining minor victim in this case. Thus, the crucial question upon which this case turns is whether, in the absence of a statute permitting minor complaining witnesses to testify via closed-circuit television, this court should exercise its supervi-

sory power to approve the procedure crafted by the trial court.

In unmistakable clarity, the Sixth Amendment of the United States Constitution provides that "[i]n *all* criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." (Emphasis added.) By judicial pronouncement—absent any input whatsoever from the citizens of the District of Columbia—my colleagues have amended the Constitution by approving a procedure for adducing testimony via closed-circuit television. In my view, under the circumstances presented here, the trial judge erred in permitting the complaining witness to testify via closed-circuit television. Any error, however, was nonetheless harmless beyond a reasonable doubt in view of the remaining competent evidence which was sufficient to sustain appellant's conviction.

This court should decline to exercise its supervisory power to craft new procedures that would permit child witnesses to avoid confronting criminal defendants directly, in contravention of the Sixth Amendment right of confrontation guaranteed to *everyone* under the Constitution; this constitutional right is also guaranteed to accused child molesters who are presumed innocent until proven guilty. It is more appropriate for the legislature, not this court, to provide the initial impetus and policy justification for crafting innovative procedures such as testifying via closed-circuit television—subject to eventual court scrutiny for constitutional compliance. Accordingly, although I concur in the judgment of the court affirming appellant's conviction, I respectfully, but nonetheless vigorously, dissent in part from the opinion of the court.

### I.

Many jurisdictions in the United States have statutes authorizing the use of closed-circuit television for adducing the testimony of victims of child abuse. *See* Majority op. at 573 n. 8. The constitutionality of these statutes was established in *Craig, supra,* 497 U.S. at 855, 110 S.Ct. at 3168–69. In *Craig,* the Supreme Court held that Maryland's

statutory procedure allowing the use of a one-way closed-circuit television system for the testimony of child abuse victims [1] was not violative of the Sixth Amendment's Confrontation Clause.[2] As the majority correctly notes, no statute exists authorizing the trial court to permit a minor victim of abuse to testify via closed-circuit television, in the District of Columbia. *See* Majority op. at 574.

The trial judge concluded that his decision regarding the implementation of this novel criminal procedure was governed by *Craig.* Moreover, as my colleagues note, the trial judge believed the child-victim could testify at the trial in the absence of a face-to-face confrontation with the appellant, provided the requisite finding of necessity was shown. *See* Majority op. at 574–575. The trial judge, however, did not consider whether a statute was required to authorize that procedure. Rather, he acted under the presumption that it was within his discretion to order the closed-circuit testimony.

I recognize that a trial judge enjoys certain inherent powers in controlling the courtroom to ensure that the proper decorum and appropriate atmosphere are established, that all parties are treated fairly, and that justice is done. *See Guaranty Dev. Co., supra,* 83 A.2d at 671. However, my colleagues should not imply from broad, open-ended language that it is within the trial court's discretion

and inherent power to order for the first time in the District of Columbia a criminal trial procedure which departs drastically from established, constitutionally mandated procedures. As the Supreme Court stated explicitly in *Craig,* "[t]hat the face to face confrontation requirement is not absolute does not, of course, mean that it may easily be dispensed with." *Craig, supra,* 497 U.S. at 850, 110 S.Ct. at 3166.

Under the auspices of acting within its discretion, the trial court created, in the first instance, a procedural rule that abridged the constitutional rights of appellant. "There are no talismanic words that can be counted upon to tell us whether and how much discretionary authority the trial judge is to have, [however, d]iscretion is powerful judicial medicine and ... judges should not be cavalier ... [in] finding it implied." Maurice Rosenberg, *Judicial Discretion of the Trial Court, Viewed from Above,* 22 Syracuse L.Rev. 635, 655, 657 (1971). There are some specific determinations which are simply not committed to a trial judge's discretion. *See Johnson v. United States,* 398 A.2d 354, 363 (D.C.1979). Under the circumstances here, I would hold that the trial court should have refrained from permitting the child-victim to testify via closed-circuit television.

The government maintains that the actions of the trial judge should nonetheless be af-

---

1. Md.Code Ann., Cts. & Jud.Proc. § 9–102 (1989). That statute provides in full:

   (a)(1) In a case of abuse of a child as defined in § 5–701 of the Family Law Article or Article 27, § 35A of the Code, a court may order that the testimony of a child victim be taken outside the courtroom and shown in the courtroom by means of closed circuit television if:
   
   (i) The testimony is taken during the proceeding; and
   
   (ii) The judge determines that testimony by the child victim in the courtroom will result in the child suffering serious emotional distress such that the child cannot reasonably communicate.
   
   (2) Only the prosecuting attorney, the attorney for the defendant, and the judge may question the child.
   
   (3) The operators of the closed circuit television shall make every effort to be unobtrusive.
   
   (b)(1) Only the following persons may be in the room with the child when the child testifies by closed circuit television:
   
   (i) The prosecuting attorney;

   (ii) The attorney for the defendant;
   
   (iii) The operators of the closed circuit television equipment; and
   
   (iv) Unless the defendant objects, any person whose presence, in the opinion of the court, contributes to the well-being of the child, including a person who has dealt with the child in a therapeutic setting concerning the abuse.
   
   (2) During the child's testimony by closed circuit television, the judge and the defendant shall be in the courtroom.
   
   (3) The judge and the defendant shall be allowed to communicate with the persons in the room where the child is testifying by any appropriate electronic method.
   
   (c) The provisions of this section do not apply if the defendant is an attorney pro se.
   
   (d) This section may not be interpreted to preclude, for purposes of identification of a defendant, the presence of both the victim and the defendant in the courtroom at the same time.

2. *Craig's* prescriptions for the use of one-way testimony are discussed in the Majority op. at 573–575.

firmed because the judge's actions complied with the dictates of *Craig, supra*. Appellant argues, however, that the trial judge was not authorized to employ the procedure approved in *Craig* because of the lack of enabling legislation in the District of Columbia. As the majority of jurisdictions have statutes authorizing this procedure, *see* Majority op. at 573 n. 8, this specific issue has been considered by very few jurisdictions. Looking first to the language of the *Craig* opinion itself, I note that the majority specifically held:

> Given the State's traditional and transcendent interest in protecting the welfare of children and buttressed by the growing body of academic literature documenting the psychological trauma suffered by child abuse victims who must testify in court, we will not second- guess the considered judgment of the *Maryland Legislature* regarding the importance of its interest in protecting child abuse victims from the emotional trauma of testifying.

*Craig, supra*, 497 U.S. at 855, 110 S.Ct. at 3168–69 (citations and internal quotation marks omitted) (emphasis added). Moreover, the Supreme Court refers specifically to the "Maryland *statute*" as clearly meeting constitutional standards.

My colleagues rely on two state appellate decisions in support of their position. Both the Supreme Court of Florida and the Court of Criminal Appeals of Texas held that *Craig* did not mandate the existence of an enabling statute in order for a trial court to employ closed-circuit procedures for adducing testi-mony of minors. Thus, in both cases, minor witnesses were permitted to testify via closed-circuit television. Both cases are distinguishable, however, from the present case.

The Supreme Court of Florida held that "absent appropriate authority[,] a trial court in a criminal case may employ a procedure if necessary to further an important public policy interest." *State v. Ford*, 626 So.2d 1338, 1340 (Fla.1993) (footnote omitted). In *Ford*, a child witnessed the murder of her mother by her stepfather. At the trial, the child's guardian *ad litem* filed a motion for a protective order requiring that the child's testimony be taken by videotape and not in open court.[3] The trial judge granted that request. On appeal, the district court reversed the conviction for the reason that no Florida statute had been enacted by the legislature authorizing the use of the procedure to present the testimony of a child who is a witness or victim in a criminal, civil, or juvenile proceeding. The court held that the trial court's procedures violated the defendant's Sixth Amendment right to confront the witnesses against him.

The Supreme Court of Florida reversed the district court, however, concluding that it was within the trial court's inherent authority to act to protect the child witness. The court ruled that the trial court's use of the unauthorized procedure was proper because the procedure was necessary to further an important public policy interest. "All courts in Florida possess the inherent powers to do all things that are reasonable and necessary for the administration of justice within the

---

3. *See* FLA.STAT.ANN. § 92.53 (West 1993), which provides in relevant part:

(1) On motion and hearing in camera and a finding that there is a substantial likelihood that a victim or witness who is under the age of 16 would suffer at least moderate emotional or mental harm if he were required to testify in open court or that such victim or witness is otherwise unavailable as defined in § 90.804(1), the trial court may order the videotaping of the testimony of the victim or witness in a sexual abuse case or child abuse case, whether civil or criminal in nature, which videotaped testimony is to be utilized at trial in lieu of trial testimony in open court.

\* \* \* \* \* \*

(4) The defendant and the defendant's counsel shall be present at the videotaping, unless the defendant has waived this right. The court may require the defendant to view the testimony from outside the presence of the child by means of a two-way mirror or another similar method that will ensure that the defendant can observe and hear the testimony of the child in person, but that the child cannot hear or see the defendant. The defendant and the attorney for the defendant may communicate by any appropriate private method.

\* \* \* \* \* \*

(7) The court shall make specific findings of fact, on the record, as to the basis for its ruling under this section.

scope of their jurisdiction, subject to valid existing laws and constitutional provisions." *Ford, supra*, 626 So.2d at 1345 (citation and internal quotation marks omitted). Accordingly, the Florida court held that protecting a child witness from the trauma of testifying in a murder case was both reasonable and necessary for the administration of justice.

In *Gonzales v. State*, 818 S.W.2d 756 (Tex. Crim.App.1991) (en banc), *cert. denied*, —— U.S. ——, 113 S.Ct. 1334, 122 L.Ed.2d 718 (1993), the Texas Court of Criminal Appeals held that the presentation of a ten-year-old witness' testimony via closed-circuit television in a murder trial did not violate a defendant's state or federal constitutional rights. As in *Ford*, *Gonzales* involved a ten-year old child witnessing the murder of a family member by the child's mother's live-in boyfriend. In the first appeal, the Court of Appeals decided that allowing the child to testify, via the closed-circuit system violated the defendant's Sixth Amendment right to confrontation because there was "no statute declaring a public policy regarding the situation, nor any legislative finding of necessity." *Gonzales, supra*, 818 S.W.2d at 764 (internal quotation marks omitted). On appeal from

that decision, the Texas Court of Criminal Appeals held that exceptions to the right to face-to-face confrontation were permitted only when necessary to further an important public policy. However, the appellate court approved the trial court's use of a two-way closed-circuit system without express statutory authority stating, "we see no reason why an expression of this important public policy must necessarily be in the form of an act or statute." *Gonzales, supra*, 818 S.W.2d at 765. The court concluded saying, "we do not read *Coy*[4] or *Craig* as mandating some sort of enabling statute for the trial court's actions." *Id.* at 766.

What my colleagues do *not* mention, however, is that in both cases, the state legislatures had enacted statutes, *unlike the District of Columbia*, that pronounced the states' public policy interest in protecting child-witnesses from the trauma of testifying in the presence of a defendant in the context of *child abuse*.[5] Though not specifically authorizing the trial courts' actions in *murder* cases, the authority for the trial courts' actions in *Gonzales* and *Ford* arguably was implied from the states' respective statutes providing for the testimony of *child abuse*

---

4. *Coy v. Iowa*, 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988).

5. *See* TEX.CODE CRIM.PROC.ANN. art. 38.071 (West 1987); FLA.STAT.ANN. § 92.54 (West 1993). TEX.CODE CRIM.PROC.ANN. art. 38.071 provides in relevant part:
> Sec. 1. This article applies only to a proceeding in the prosecution of an offense, including but not limited to an offense under Chapter 21, Penal Code, as amended, or Section 43.25, Penal Code, as amended, alleged to have been committed against a child 12 years of age or younger, and applies only to the statements or testimony of that child.
> \* \* \* \* \* \*
> Sec. 3. The court may, on a motion of the attorney for any party, order that the testimony of the child be taken in a room other than the courtroom and be televised by closed circuit equipment in the courtroom to be viewed by the court and the finder of fact in the proceeding. Only the attorneys for the defendant and for the state, persons necessary to operate the equipment, and any person whose presence would contribute to the welfare and well-being of the child may be present in the room with the child during his testimony. Only the attorneys may question the child.... The court shall permit the defendant to observe and hear the testimony of the child in person, but shall

ensure that the child cannot hear or see the defendant.

FLA.STAT.ANN. § 92.54 provides in relevant part:
> (1) Upon motion and hearing in camera and upon a finding that there is a substantial likelihood that the child will suffer at least moderate emotional or mental harm if required to testify in open court or that such victim or witness is unavailable as defined in § 90.804(1), the trial court may order that the testimony of a child under the age of 16 who is a victim of or witness to an unlawful sexual act, contact, intrusion, penetration, or other sexual offense be taken outside of the courtroom and shown by means of closed circuit television.
> \* \* \* \* \* \*
> (4) During the child's testimony by closed circuit television, the court may require the defendant to view the testimony from the courtroom. In such a case, the court shall permit the defendant to observe and hear the testimony of the child, but shall ensure that the child cannot hear or see the defendant. The judge and defendant and the persons in the room where the child is testifying may communicate by any appropriate electronic method.
> (5) The court shall make specific findings of fact, on the record, as to the basis for its ruling under this section.

victims to be adduced via closed-circuit television.

In the District of Columbia, there has been no legislative pronouncement comparable to Md.Code Ann., Cts. & Jud.Proc. § 9–102, see note 1, *supra*, Tex.Code Crim.Proc.Ann. art. 38.071, or Fla.Stat.Ann. § 92.54, see note 5, *supra*, that even remotely authorizes closed-circuit testimony for child witnesses in any context—including child abuse and murder cases. The government, nonetheless, asks this court to formulate, in the first instance, the public policy of the District of Columbia by holding that the public interest in protecting minor victims of sex crimes from further public trauma and embarrassment outweighs a defendant's right to face-to-face confrontation. I would decline the invitation to judicially articulate public policy for the citizens of the District of Columbia.

According to *Craig, supra*, a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial if a state determines that denial of such confrontation is necessary to further an important public policy. Such public policy determinations on behalf of a state are usually made by the state legislature. *See Twin City Pipe Line Co. v. Har-*

*ding Glass Co.*, 283 U.S. 353, 357, 51 S.Ct. 476, 158, 75 L.Ed. 1112 (1931). Indeed, it has traditionally been the function of legislative bodies in the District of Columbia to formulate and declare the public policy of the city through the creation of legislation, both substantive and procedural, for the District. *See Manhattan Co. v. Goldberg*, 38 A.2d 172, 174 (D.C.1944) ("[d]etermination of public policy is primarily a matter for the legislature") (citing *Twin City Pipe Line Co., supra*, 283 U.S. at 357, 51 S.Ct. at 158).[6]

The legislative enactments passed by the Council and approved by the Mayor are then reviewed by the judicial branch of government. This court is the final judicial authority in this jurisdiction on matters of local law.[7] This court also exercises its own judgment on federal constitutional questions[8] and may even indulge in judicial rule-making *required* by constitutional limitations on the power of government.[9] The novel criminal procedure ordered by the trial court in the present case, however, absent precedent that I am unaware of, was in no way *required* by the Constitution.[10]

## II.

Even assuming that this court may determine that denial of such confrontation is

6. The legislative process begins when a member of the Council of the District of Columbia introduces a bill before the Council. Once a bill has been introduced, the rules of the Council require notification of intended action to be placed in the District of Columbia Register at least fifteen days prior to enactment. The bill is then referred to one or more committees after introduction. The committees are not required to hold public hearings, though the above-cited notice affords interested persons an opportunity to comment. Next, the bill is reported to the full Council by the committee and voted upon. Once passed by the Council, the act is transmitted to the Mayor to either approve or veto. This process, specifically the procedure for public notification, affords interested parties an opportunity to participate in the public policy debate. *See* D.C.Code §§ 1–227, –229 (1992 & 1993 Supp.).

7. The District of Columbia Court of Appeals is the final expositor of District of Columbia Law. *See Estep v. Construction Gen., Inc.*, 546 A.2d 376, 384 (D.C.1988) (Mack, J., dissenting); *Gillis v. United States*, 400 A.2d 311, 313 (D.C.1979); D.C.Code § 11–102 (1989 & 1993 Supp.) ("The highest court of the District of Columbia is the District of Columbia Court of Appeals").

8. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971) (District of Columbia Court of Appeals, as the highest court of the District of Columbia, is analogous to the highest court of a state in that District of Columbia Court of Appeals can exercise its own judgment on federal constitutional questions until those questions are answered by the Supreme Court).

9. *See Lewis v. United States*, 632 A.2d 383 (D.C. 1993) (holding that search of a vehicle without a warrant which defendant had parked, locked, and walked away from was not reasonable under the Fourth Amendment).

10. There are some procedures in criminal trials that are required under the Constitution. *Cf. Graves v. United States*, 472 A.2d 395 (D.C.) (the government's power to compel testimony is not absolute; it must yield to the Fifth Amendment privilege against compulsory self-incrimination), *cert. denied*, 469 U.S. 846, 105 S.Ct. 158, 83 L.Ed.2d 95 (1984); *Monroe v. United States*, 389 A.2d 811 (D.C.) (the commands of the Sixth Amendment require that a criminal defendant be afforded the right to effective assistance of counsel), *cert. denied*, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978).

necessary to further an important public policy and, thus, may adopt this novel criminal procedure pursuant to its supervisory powers, "[t]hat [a] Court is empowered to prescribe public policy does not mean it must exercise that power as a matter of course." *Gonzales, supra,* 818 S.W.2d at 769 (Clinton, J., dissenting). The judiciary, generally, is not well-suited to formulate public policy.[11] Appellate judges address a particular set of facts and the legal issues raised in those factual scenarios.[12] They are not accessible to the public.[13] Only lawyers have an opportunity to communicate with appellate judges, as is typical, and that communication is formalized to include only briefs and oral argument for each party.[14] Other than the communications from the lawyers for the parties on appeal, this court has not had the opportunity to hear public opinion and comment on the desirability *vel nom* of closed-circuit television testimony for child-witnesses in child abuse cases.

*Hochheiser v. Superior Court (People),* 161 Cal.App.3d 777, 208 Cal.Rptr. 273, 277 (1984), a case of first impression decided by the Court of Appeals of California, involved the precise issue presented here. Issuing a writ of prohibition restraining the trial court from enforcing its order directing the taking of the complaining minor victims' testimony by closed-circuit television, the Court of Appeals stated that the procedure, which represented a "far-reaching innovation in a criminal trial[, was] more appropriately left to the Legislature for initial consideration." Id., 161 Cal. App.3d 777, 208 Cal.Rptr. at 276.

I am persuaded by the rationale employed by the California Court of Appeals that,

when confronted with circumstances like those in the present case, we should refrain from putting our imprimatur on the novel procedure crafted by the trial court. The role of the judiciary is to interpret the laws, and in so doing to protect constitutional rights, not to legislate. *See Bogen v. Green,* 239 A.2d 154, 155 (D.C.1968) ("it is our function to say what the law is, rather than what it should be"). Thus, I would concur with the Court of Appeals of California in its articulation of the need for judicial restraint in a case such as this:

> It is one thing for a court to prescribe judicial procedures *necessary* to protect some fundamental constitutional principle or to effectuate some specific constitutional guarantee of individual liberty. [Citations omitted.] It is quite another thing for a court to design judicial procedures which are in no way required by higher law but which may seem to some socially desirable and perhaps may be *permitted*—at least to some extent—by our state and federal Constitutions. In the former instance, constitutional principles guide the court's hand; in the latter instance constitutional principles may well have to stay the court's hand. Given the difficulty of the constitutional questions posed by [such] procedures, it is far better for this court to pass judgment, if and when necessary, on an integrated legislative document than on our own conditional decree by which we might seek to smooth the constitutionally rough edges of the order of the court below.

11. "While in the particular case, the judge may come equipped to grasp the situation, in Llewellyn's term, by use of his situation-sense, this is no substitute for what is required for wise and broad legislating. For legislation, opportunities for unlimited external investigation are required and are substantially available. Moreover, in the nature of the judicial profession, and more so as the judge remains in his truly cloistered activity, disciplined by the etiquette and ethics that govern the conduct of a judge, and as importantly, the conduct of others toward him, the judge is ever removed more distantly from the maddening scene. This entails a loss of contact with the greater environment, and, for many men, a loss of sense of the movements of their time." Charles D. Breitel, *The Lawmakers*, 65 Co-

lum.L.Rev. 749, 765, 767–72 (1965), *quoted in* RUGGERO J. ALDISERT, THE JUDICIAL PROCESS, CHAPTER I: ANATOMY OF JUDGE-MADE LAW, SECTION 3: THE JUDGE AS LAWMAKER 101 (1976).

12. "[T]he judge is confined by the record in the case, which in turn is confined to legally relevant material, limited by evidentiary rules." Roger J. Traynor, *Reasoning in a Circle of Law*, 56 VA. L.Rev. 739, 742–43, 749–50 (1970), *quoted in* ALDISERT, *supra* note 11, at 117.

13. *See* ALDISERT, *supra* note 11.

14. *See* D.C.App.R. 28, 31(a), 35(f).

*Hochheiser, supra,* 161 Cal.App.3d 777, 208 Cal.Rptr. at 277 (quoting *Reynolds v. Superior Court of Los Angeles County,* 12 Cal.3d 834, 117 Cal.Rptr. 437, 444–45, 528 P.2d 45, 52–53 (1974)).

The procedure whereby O.H.B. was permitted to testify against appellant via closed-circuit television may be socially desirable, and a statute authorizing such testimony may well be constitutionally permissible. *See Craig, supra.* However, it should not be this court's role to simultaneously create, in the first instance, this novel criminal procedure and then pass on its constitutionality. Notwithstanding *Craig,* the court should not exercise its supervisory powers here and declare on behalf of the citizenry of the District of Columbia what its public policy regarding the testimony of child witnesses in sex abuse cases should be. "We cannot declare a public policy based upon a temporary extraordinary situation." *Manhattan Co., supra,* 38 A.2d at 174. In deferring to the legislature, the court would simply act consistently with the doctrine of separation of powers by interpreting the laws, not creating them. *See United States v. Shaw,* 226 A.2d 366, 368 (D.C.1967) ("[c]ourts ... should carefully refrain from encroachment on the prerogatives of another department of the [g]overnment") (footnote omitted).

Thus, I would conclude that, under the circumstances presented here, the trial judge erred in permitting the complaining witness to testify via closed-circuit television, and that this procedure ran afoul of the Sixth Amendment's requirement of face-to-face confrontation; I would then consider whether that error was harmless.

### III.

As appellant's Sixth Amendment right to face-to-face confrontation was abridged as a result of the trial court's actions, I would apply the constitutional harmless error test established in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). That test provides that "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986). *Coy v. Iowa,* 487 U.S. 1012, 1021, 108 S.Ct. 2798, 2803, 101 L.Ed.2d 857 (1988), which specifically held that any error stemming from the denial of face-to-face confrontation was subject to the *Chapman* harmless error analysis, provides the following guidance in assessing whether the denial of face-to-face confrontation constitutes harmless error:

> As assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence.

*Id.* at 1021–22, 108 S.Ct. at 2803.

The test set forth in *Chapman* and *Coy* "does not require conclusive or absolute proof o[f] harmlessness...." However, "[t]he government must show convincingly that the alleged prejudice was highly unlikely, and that reversal on the grounds of such prejudice would be unreasonable." *Kleinbart v. United States,* 553 A.2d 1236, 1240 (D.C.1989) (citation omitted); *see also Hazel v. United States,* 599 A.2d 38, 46 (D.C.1991) (applying *Chapman* harmless error test to trial court's reinstruction of jury in defendant's involuntary absence). Appellant's primary contention is that he was prejudiced by the denial of a face-to-face confrontation with the complaining witness.[15] He further contends that once the court made the determination to use closed-circuit television, it was apparent that the jurors inferred that the court had already determined that the child

---

15. "[S]ome constitutional errors—such as denying a defendant the assistance of counsel at trial, or compelling him to stand trial before a trier of fact with a financial stake in the outcome—are so fundamental and pervasive that they require reversal without regard to the facts or circumstances of the particular case." *Van Arsdall,* *supra,* 475 U.S. at 681, 106 S.Ct. at 1436. There is no precedent that I am aware of establishing the denial of face-to-face confrontation as a constitutional error deemed prejudicial in every case. Thus, I find unpersuasive appellant's effort to characterize the trial court's actions as *per se* reversible error.

witness was victimized. The result, appellant argues, is harmful error requiring reversal of his conviction.

It follows from *Coy, supra,* that in resolving the issue of whether the error was harmless or not, I would, of necessity, also consider appellant's final contention that the evidence was legally insufficient to sustain his conviction because O.H.B. did not testify that appellant had committed the offense. Moreover, appellant argues that O.H.B.'s limited testimony should not be considered in evaluating the sufficiency of the evidence because it was admitted in violation of his constitutional rights under the confrontation clause. Appellant also claims that the evidence is insufficient because it includes the hearsay testimony of Officer Milagros Morales.

Viewing the evidence presented at trial in the light most favorable to the government,[16] I would hold that there is ample evidence to sustain appellant's conviction for carnal knowledge, *see* Majority op. at 572–573. "Reversal is permissible on sufficiency grounds only when there is no evidence upon which a reasonable juror could infer guilt beyond a reasonable doubt." *Jones, supra,* 625 A.2d at 288. On review, this court does not distinguish between direct and circumstantial evidence, *see Irick v. United States,* 565 A.2d 26, 30 (D.C.1989), and the government need not negate every possible inference of innocence. *See id.* Although Officer Morales' testimony was rank hearsay, trial counsel for appellant, who is also counsel on appeal, did not object to the testimony below, and has not requested that this court review for plain error the issue of whether the trial court erred in allowing the testimony to be admitted.[17] Given that "[h]earsay evidence admitted without objection may be properly considered by the trier of fact and given its full probative value," *Alston v. United States,* 509 A.2d 1129, 1131 n. 9 (D.C.1986), and that

even improperly admitted evidence may be considered in evaluating the sufficiency of the evidence, *see Lockhart v. Nelson,* 488 U.S. 33, 40–42, 109 S.Ct. 285, 290–92, 102 L.Ed.2d 265 (1988), I would hold that the evidence in this case is sufficient to sustain appellant's conviction for carnal knowledge.

Reviewing the record as a whole, I would conclude that the trial court's error was harmless beyond a reasonable doubt. The testimony of T.H.B., Officer Pedro Garcia, pediatrician Karen J. Narkewicz, and Officer Milagros Morales provided overwhelming circumstantial evidence sufficient to sustain appellant's conviction for carnal knowledge. Furthermore, the prejudice, if any, regarding the manner in which O.H.B. testified, was minimized by the trial judge as he stated the following to the jury: "Members of the jury, the next witness is a child of tender years. Therefore, the [c]ourt is permitting the testimony to be taken through closed circuit t.v." This explanation given by the trial judge for the closed-circuit procedure did not in any way imply that the child-witness had been victimized.

In light of the compelling testimony of the government witnesses who preceded O.H.B. and the scant testimony of O.H.B. herself, who was unable to testify about what happened to her on the night she was left at home alone with appellant, I would find no prejudice to appellant requiring reversal of his conviction.[18] Though I would conclude that the trial court erred in employing the closed-circuit procedure without a legislative enactment authorizing the use of closed-circuit testimony for minor victims in the District of Columbia, I would nonetheless find that the government has met its burden of proving the error harmless beyond a reasonable doubt.

---

**16.** "The court must view the evidence presented at trial 'in the light most favorable to the government, recognizing the [jury's] role in weighing the evidence, determining the credibility of witnesses, and drawing justifiable inferences from the evidence.'" *Jones v. United States,* 625 A.2d 281, 288 (D.C.1993) (quoting *Ford v. United States,* 498 A.2d 1135, 1137 (D.C.1985)).

**17.** *But cf. Mack v. United States,* 570 A.2d 777, 782 (D.C.1990) (reviewing for plain error whether the trial judge erred by failing to intervene *sua sponte* to assure the exclusion of hearsay testimony).

**18.** It is significant in this regard that appellant's trial counsel chose not to cross-examine O.H.B. after her scant testimony on direct examination by the government.

Accordingly, I would affirm the judgment of conviction but for reasons different from those relied on by my colleagues.