*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CF-81

MALIK BILAL, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-11967-14)

(Hon. Milton C. Lee, Trial Judge)

(Argued November 20, 2018                    Decided October 15, 2020)

*James Whitehead*, Public Defender Service, with whom *Samia Fam, Mikel-Meredith Weidman*, *Daniel S. Harawa*, and *Fleming Terrell*, Public Defender Service, were on the brief, for appellant.

*Anne Y. Park*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time, and *Elizabeth Trosman, Nicholas P. Coleman, Glenn Kirschner*, and *Katherine Earnest*, Assistant United States Attorneys, were on the brief, for appellee.

Before THOMPSON and BECKWITH, *Associate Judges*, and RUIZ, *Senior Judge*.

Opinion for the court by *Associate Judge* THOMPSON.

Concurring opinion by *Senior Judge* RUIZ at page 30.

THOMPSON, *Associate Judge*: After a jury trial, appellant Malik Bilal was found guilty of second-degree murder while armed and carrying a dangerous weapon outside the home or place of business. Appellant asserts that the trial court "misconceived the requirements of [Super. Ct. Crim.] Rule 12.2(c)," infringed upon his Fifth Amendment privilege, abused discretion, and prevented him from presenting a complete defense when it ruled that he must submit to a mental examination by a government expert as a condition of introducing his own expert's testimony about his claimed post-traumatic stress disorder ("PTSD"). We affirm.

## I.

### The Evidence at Trial

The evidence at trial established that appellant stabbed his co-worker Alonzo "Reds" Beasley with a pocket knife. Arnitta Cowser, another co-worker, testified that after appellant told Beasley not to touch appellant's truck and Beasley reached into the truck to retrieve a thermos despite appellant's order, appellant started pushing, shoving, and hitting Beasley. According to Cowser, Beasley, who had nothing in his hands, backed away, but appellant continued swinging "stead[il]y [and] coming at" Beasley; Cowser eventually saw appellant stab Beasley in the neck and saw Beasley fall, with blood coming "from everywhere." Deneira

Owens, who was in the area at the time, did not see the entire incident but did see a man whose skin had a reddish tone (Beasley) running away from a man who fit appellant's description, and then saw that second man make a punching or thrusting motion toward the first man's torso and saw the first man fall to the ground. Owens testified that while the punching motion was occurring, the first man had his hands up and was saying, "Don't do this." Danyell Adams also saw a portion of the altercation and testified that the man who "passed away" was being chased by the other man. Adams heard the man who was swinging the knife and chasing the other man say, in "[a]n aggressive angry tone" as he was walking back to his truck, "I told him not to touch my truck." Beasley sustained six stab wounds and bled to death from his injuries.

Appellant testified that Beasley was very "aggressive" and angry towards him on the job, saying things such as, "I'll kill your ass" and "talk[ing] about how he had put in work with his gun before" (i.e., had victimized people with his gun). Appellant testified that Beasley's statements made him feel "threatened" and "fearful," so much so that he carried a pocketknife for protection. Appellant told the jury that on the day of the incident, he saw Beasley jerking on his waistband as he was insulting appellant, and that he (appellant) was "a hundred percent sure" that Beasley had a gun, was "brandishing" it, and would take it out and shoot

appellant if appellant did anything to provoke him. Appellant testified that he told Beasley to leave him alone and to get away from his truck, but that Beasley instead swung and hit appellant in the face. A fight between the two men ensued, with Beasley saying that he would kill appellant. At one point, Beasley turned his body, and appellant believed he was reaching for his gun, so appellant panicked, pulled out his knife, and started swinging. Appellant told the jury that it was after he was arrested (two days later) that he learned that Beasley had died. Appellant further testified that he believed that if he had not swung the knife, Beasley would have shot and killed him. Police did not recover a gun from the scene.

## II.

### Appellant's Proposed Expert Testimony
### and the Trial Court's Ruling on the Government's Motion to Compel a
### Mental Examination by the Government's Expert

On February 25, 2016, prior to trial and pursuant to Super. Ct. Crim. R. 16 (b)(1)(C)(ii), the defense filed a notice of its intention to present expert testimony from psychologist Dr. Nicole Rafanello. Appellant's original proffer was that Dr. Rafanello would testify "based on an evaluation of Mr. Bilal over the course of several meetings with him" (which included "testing of Mr. Bilal using several diagnostic tests") and on a review of his records, and would specifically testify that appellant "is diagnosed with, and has long suffered from, post-traumatic stress

syndrome (PTSD) and complex trauma, and was suffering from these conditions at the time of the incident in this case." The notice further stated that Dr. Rafanello would testify about how appellant's conditions "impact a person's perceptions and behaviors, particularly in threatening or violent situations." The notice stated in addition that Dr. Rafanello would testify that appellant "was experiencing these symptoms [of PTSD and complex trauma] prior to and through the time period when the incident in this case happened[,]" and "experienced heightened fear of being assaulted and injured, such as . . . reacting strongly to perceived threats of violence." Appellant later told the court in a filing that "Dr. Rafanello did not speak with Mr. Bilal about the facts and circumstances of the incident in this case, and will offer no testimony or opinion about the incident in this case."

The government filed a motion to preclude Dr. Rafanello's testimony, arguing *inter alia* that appellant was improperly seeking to introduce expert testimony to support inadmissible diminished-capacity evidence under the guise of a self-defense claim. The defense responded that Dr. Rafanello's testimony would not be in support of a diminished-capacity defense, but would be relevant to appellant's perceptions at the time of the incident and to the credibility of his claim of self-defense — specifically, as to whether he "actually . . . believed [the] force [he used] to be necessary to avoid his own serious bodily harm."

On March 25, 2016, the court heard argument on the government's motion and ruled that the proffered expert testimony would be permitted if the evidence at trial were to support a self-defense claim. Upon that ruling, the prosecutor asked the court "to permit the [g]overnment to obtain its own expert and . . . for Mr. Bilal to be subject to examination" by that expert. The defense objected, and the court said that it would defer ruling until the parties' next appearance in court.

On March 28, 2016, at the next hearing, the court asked the prosecutor whether it would "be enough . . . for [the government] to just engage [its] own expert to help [the prosecutor] cross-examine [the defense] expert." The prosecutor responded in the negative. Defense counsel told the court that if the court were to allow a government expert to evaluate appellant, the defense "might opt to go a completely different direction with this and withdraw the notice to call Dr. Rafanello" and choose "another way of going about presenting [the PTSD] evidence," i.e., have the expert "testif[y] just in general about what the condition is . . . not having evaluated the individual but testifying to what the condition is, the symptoms, how it works and the like, and then the jury is free to assess it." The court again deferred its ruling, requesting additional briefing on whether it should compel appellant to submit to a mental examination by a government expert as a

condition of admitting the defense expert testimony. The court said that this was "unchartered territory"[1] and that it would try to "do a balance" and "arrive at the right answer for everybody."

After the parties filed briefs,[2] and after a hearing on June 3, 2016, the trial court issued a written order on August 5, 2016, granting the government permission to examine appellant through its own expert. The court reasoned that Super. Ct. Crim. R. 12.2 "is specifically designed to address th[e] situation" presented in this case, i.e., where "the defense will . . . ask the jury to consider whether as a result of a mental health condition[,] the Defendant had a subjective belief of an imminent danger of bodily harm such that he should not be held accountable for . . . [m]urder." The court found that where the defense will present expert testimony concerning the defendant's mental health condition, Rule 12.2(c) "provide[s] the trial court with the authority to order the defendant to submit to 'mental examinations by a psychiatrist or other expert.'" The court found that it "seem[ed] only fair and proper" "[i]n this instance" to give a government expert

---

[1] The court may actually have said or meant "uncharted territory."

[2] Appellant argued that there was no constitutional, statutory, or case-law authority for the court to compel him to be examined by a government expert, that Rule 12.2 applies only to insanity defenses, and that granting the government's request would violate appellant's Fifth Amendment rights by requiring him to be a witness against himself.

the opportunity to examine appellant "so that the government could be on equal footing in its effort to meet the force of the defense expert evidence." The court ruled that the government expert would be permitted to explore whether appellant was "appropriately diagnosed" with PTSD, but would "not be permitted to inquire as to the facts and circumstances surrounding the offense."[3]

On August 15, 2016, withdrawing his earlier notice, appellant filed a notice stating that he would not present evidence of Dr. Rafanello's evaluation of him or her conclusions as to his diagnosis, and that he would not submit to an evaluation by a government expert. Instead, the defense expert would be called to testify "about PTSD and complex trauma generally" and how these conditions may affect an individual. At a hearing on October 19, 2016, the trial court ruled that it would permit appellant to present the revised expert testimony — without having to submit to an examination by a government expert — so long as he laid a proper factual foundation, i.e., something "in the record that supports the notion that Mr.

---

[3] The court also ordered the defense to disclose to the government "all underlying data used by the defense expert including, but not limited to, Dr. Rafanello's report, notes, raw data, testing protocols, and any other materials generated by Dr. Rafanello during her interview, records demonstrating that Defendant was previously diagnosed with PTSD and complex trauma, records from before this case revealing Defendant's experiences of trauma and violence leading to his diagnosis, and any other material relied on by the expert in reaching her conclusion."

Bilal could be suffering from this[.]" Ultimately, appellant chose not to present an expert on PTSD, stating that "the defense is opting not to present that evidence . . . [g]iven the way the trial has gone."

Appellant now argues that the trial court erred "by reflexively ordering a compelled examination pursuant to Rule 12.2," in an effort to put the parties on equal footing, "when there was no indication that the government needed the examination to rebut the proffered PTSD expert evidence." Appellant emphasizes that because Rule 12.2 "limits a court's authority to order a mental examination to 'appropriate cases,'" it necessarily implies that not every case in which the defendant gives notice under Rule 12.2(b) will be appropriate for a compelled examination, and does not authorize the court to order a mental examination by the government's expert solely on the ground that this "seems fair." Appellant further asserts that the trial court was obligated to, but failed to, engage in a fact-specific analysis to determine whether the government needed its own evaluation of him. Appellant argues that an inquiry would have shown that the government had "more than enough time, material, and access to both Mr. Bilal [through cross-examination[4]] and the defense expert to prepare for trial," and he contends that

---

[4] Appellant states that the court ruled that before the defense expert could testify, appellant would have to take the stand and face cross-examination. Such a

(continued…)

"the government did not proffer a single reason why it needed the evaluation to meet the defense expert evidence." Appellant asserts that the court's ruling "led to the exclusion of the critical PTSD evidence" on a central component of his self-defense claim ("whether he subjectively believed that he was in imminent danger"); severely hampered his defense; and entitles him to reversal of his convictions, because the error was not harmless beyond a reasonable doubt.

## III.

### Analysis

A.   *The trial court had inherent authority to order a mental examination.*

In the trial court, appellant argued that Rule 12.2 does not supply authority for the Superior Court to compel a mental examination when the defendant is not asserting an insanity defense, and that there is no other authority in rule, statute or case law for the court to do so. On appeal, appellant appears to have abandoned

---

(…continued)
requirement would be a blatant violation of appellant's rights under the Fifth Amendment. But the record shows that no such violation happened in this case because the court ruled only that a foundation had to be laid for the relevance of the defense expert's PTSD testimony. The court couched its comments in terms of "should [the defendant] testify at trial." As described above, appellant did take the stand to testify that he acted in self-defense.

his blanket no-authority argument. He acknowledges case authority that the trial court may order such an examination pursuant to its inherent authority. However, he asserts that the court must exercise that authority with restraint, based on the particular circumstances of the case before it. As to Rule 12.2, he emphasizes that the Rule limits the trial court's authority to order a mental examination to "appropriate cases." He asserts that here, the trial court was improperly focused on what "seem[ed] fair" and failed to conduct a fact-specific inquiry to determine whether the government needed its own examination of him (which, he contends, it did not).

Appellant's acknowledgment that the Superior Court has inherent authority to order a defendant to submit to a mental examination is well-founded. *See Rural Hicks-Bey v. United States,* 649 A.2d 569, 575 (D.C. 1994) ("[T]he trial court has inherent authority, unless otherwise specifically precluded, to control the conduct of the proceedings before it, in order to ensure . . . that all parties are treated fairly, and that justice is done."); *United States v. McSherry,* 226 F.3d 153, 157 (2d Cir. 2000) ("[I]t was a reasonable exercise of inherent power to condition the defendant's use of expert opinion testimony upon his examination by prosecution experts, who could then testify as to their own observations and evaluations."); *United States v. Webster*, 162 F.3d 308, 339 (5th Cir. 1998) (holding that the

district court had inherent authority to compel the defendant "to submit to a mental health exam by a government expert as a prerequisite to introducing his own expert psychiatric testimony"; explaining that "[b]efore the enactment in 1974 of Fed. R. Crim. P. 12.2, which establishes the procedures governing psychiatric exams at trial, numerous courts had recognized the existence of inherent judicial authority to order a defendant to give the government notice of a psychiatric defense and to submit to examination by a government expert"; noting that the Fifth Circuit, too, in other circumstances had found "inherent power to compel a psychological examination of a criminal defendant."); *United States v. Davis*, 93 F.3d 1286, 1295 (6th Cir. 1996) (court has "inherent authority  to order a reasonable, noncustodial examination of a defendant under appropriate circumstances").[5]

Appellant is also correct that a trial court must exercise its inherent authority with restraint, using it only as "a reasonable response to the problems and needs

---

[5]    *See also* Super. Ct. Crim. R. 57(b) ("the court may regulate practice in any manner consistent with applicable law and these rules"); *United States v. White*, 21 F. Supp. 2d 1197, 1198, 1198 n.2, 1200 (E.D. Cal. 1998) (holding that court may use its "supervisory power" [the term the court used for "inherent authority" in criminal matters] under Fed. R. Crim. P. 57(b) to compel a mental examination in a case where defendant sought to use her psychiatric expert's examination findings to support a diminished capacity defense, reasoning that "fundamental fairness" and "judicial common sense" require that the government "be able to follow where the defendant has led" (brackets and internal quotation marks omitted)).

that provoke it." *Degen v. United States*, 517 U.S. 820, 823-24 (1996). Further, courts have recognized that in exercising inherent authority, a trial court should fashion its order to comply with the relevant procedural rule (here, Rule 12.2). *See, e.g., United States v. Richter*, 488 F.2d 170, 173-74 (9th Cir. 1973) (recognizing that when exercising its inherent authority, a court should look to the relevant procedural rule for guidance).

B.   *The advisory committee notes to Fed. R. Crim. P. 12.2 clarify what is an "appropriate case" in which to order a mental examination to rebut defense expert testimony about a defendant's mental condition bearing on guilt.*

Super. Ct. Crim. R. 12.2(b) provides that the defense must give notice to the government if the "defendant intends to introduce expert evidence relating to a mental disease or defect or any other mental condition of the defendant bearing on the issue of guilt[.]"  Under Rule 12.2(c)(1) as in effect at the time of appellant's trial (and currently), "[i]n an appropriate case the court may, upon motion of the prosecutor or upon its own initiative, order the defendant to submit to one or more mental examinations by a psychiatrist or other expert designated for this purpose in the order of the court."[6]  Appellant argues that an "appropriate case" within the

---

   [6]  As the government's brief notes, appellant relies on a number of pre-2002 cases in which courts held that then-Fed. R. Crim. P. 12.2(c) did not encompass

(continued…)

meaning of Rule 12.2(c) "is one where the examination is necessary for the government's effective 'pretrial preparation,'" a circumstance that appellant contends was not satisfied in this case. "The correct interpretation and application of Rule [12.2] . . . is a legal question which we review *de novo*." *Ferguson v. United States*, 866 A.2d 54, 59 (D.C. 2005).

We are not persuaded that the interpretation appellant urges is what is meant by the term "appropriate case" in Rule 12.2(c)(1). "When interpreting a Superior Court rule, we frequently find guidance in the advisory committee's notes to the corresponding federal rule." *District of Columbia v. Jackson*, 878 A.2d 489, 492 (D.C. 2005).[7] That guidance is especially pertinent here, as appellant has acknowledged that this jurisdiction's Rule 12.2 "is based on the original federal rule 12.2."

---

(…continued)
compelling a defendant who was not asserting an insanity or competency defense to submit to a mental examination. However, the federal rule was amended in 2002 to clarify that it encompasses a mental examination for a defendant who has indicated an intention to raise a defense of mental condition bearing on the issue of guilt. Fed. R. Crim. P. 12.2 advisory committee's notes on the 2002 amendments.

[7] In addition, "[w]hen one of our procedural rules is nearly identical to or the functional equivalent of a federal procedural rule, we look to cases interpreting the federal rule for guidance on how to interpret our own." *Estate of Patterson v. Sharek*, 924 A.2d 1005, 1009–1010 (D.C. 2007).

The phrase "in an appropriate case" appeared in the original federal rule in 1975, upon enactment of Public Law 94-64. *See* 89 Stat. 370, 373 (July 31, 1975) ("In an appropriate case the court may, upon motion of the attorney for the government, order the defendant to submit to a psychiatric examination by a psychiatrist designated for this purpose in the order of the court."). The advisory committee notes to Fed. R. Crim. P. 12.2 that pertain to the 1975 enactment address what was meant by the reference to "appropriate cases":

> The Committee notes that the rule does not attempt to resolve the issue whether the court can constitutionally compel a defendant to undergo a psychiatric examination when the defendant is unwilling to undergo one. The provisions of subdivision (c) are qualified by the phrase, "In an appropriate case." If the court cannot constitutionally compel an unwilling defendant to undergo a psychiatric examination, then the provisions of subdivision (c) are inapplicable in every instance where the defendant is unwilling to undergo a court-ordered psychiatric examination. The Committee, by its approval of subdivision (c), intends to take no stand whatever on the constitutional question.

Advisory Committee notes on the 1975 enactment; *see also United States v. Davis*, 93 F.3d 1286, 1295 (6th Cir. 1996) (holding that "it [is] unlikely that the Supreme Court or Congress intended the first sentence of Rule 12.2(c) to resolve, *sub silentio*, the Fifth Amendment concerns arising from a compelled, custodial pretrial examination of a criminal defendant concerning her or his mental state at the time of the alleged offense[.]"). As the note expressly states, if there is a constitutional

bar to a compelled examination, the "appropriate case" standard will not be met. In sum, as the Advisory Committee understood original Fed. R. Crim. P. 12.2(c), its reference to an "appropriate case" is a reference to a case in which the court "may," consistent with the Fifth Amendment, compel an unwilling defendant to submit to a psychiatric examination by a government expert.

C. *This was an "appropriate case" in which to order a mental examination.*

"The Fifth Amendment guarantees that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . .'" *Kansas v. Cheever*, 571 U.S. 87, 93 (2013). The Supreme Court held in *Estelle v. Smith*, 451 U.S. 454 (1981), that presentation of the defendant's statements made in the course of a court-ordered psychiatric examination violates the defendant's Fifth Amendment rights when the defendant has neither initiated the examination nor put his mental capacity in dispute at trial. *See id.* at 468. Conversely, in *Cheever*, the Supreme Court held that the Fifth Amendment does not prohibit the government from introducing evidence from a court-ordered mental evaluation of a criminal defendant to rebut that defendant's presentation of expert testimony in support of a mental-status-based defense (in *Cheever*, voluntary intoxication). 571 U.S. at 89–90; *see also id.* at 98 ("We hold that where a defense expert who has examined the defendant testifies that the defendant lacked the requisite mental state to commit a

crime, the prosecution may offer evidence from a court-ordered psychological examination for the limited purpose of rebutting the defendant's evidence."). The Court reasoned that "[w]hen a defendant presents evidence through a psychological expert who has examined him, the government likewise is permitted to use the only effective means of challenging that evidence: testimony from an expert who has also examined him." *Id.* at 94.

In *Cheever*, the examination by a government expert had already occurred in connection with an eventually aborted federal trial;[8] the narrow issue before the Court was whether, during a subsequent state prosecution, the testimony of the government expert could be admitted consistent with the Fifth Amendment. The Court did not specifically consider the validity of the order that, in an earlier case, compelled Mr. Cheever to submit to an examination by the government's expert. Thus, *Cheever* did not resolve the precise issue presented here: whether, consistent with the Fifth Amendment, a trial court may compel the defendant to submit to an

---

[8]  Mr. Cheever filed a notice under Rule 12.2 that he intended to introduce expert evidence relating to his intoxication by methamphetamine at the time of the charged offense, "which negated his ability to form specific intent, *e.g.*, malice aforethought, premeditation and deliberation." *Id.* at 90–91. The district court ordered him to submit to a psychiatric evaluation by a forensic psychiatrist, to assess how methamphetamine use had affected him when he shot his victim. *Id.* at 91. The forensic psychiatrist "interviewed Cheever for roughly 5 1/2 hours." *Id.*

examination by a government mental health expert after the defense has given notice of its intent to introduce expert evidence relating to a mental condition of the defendant bearing on the issue of guilt.

Nevertheless, courts have relied on *Cheever* as a basis for rejecting arguments that a trial court violates the defendant's Fifth Amendment rights by refusing to let a defense mental health expert testify about the defendant's mental condition unless the defendant submits to an examination by a government mental health expert. *See, e.g.*, *Hernandez v. Davis*, 750 F. App'x 378, 383 (5th Cir. 2018) (denying a certificate of appealability on Mr. Hernandez's claim that the state trial court violated his Fifth Amendment rights "by refusing to allow his mental-health expert . . . to testify on Hernandez's diminished mental capacity unless he first submitted to an examination performed by the State's mental-health expert"). The *Hernandez* court said the following about what *Cheever* implies regarding compelled mental examinations:

> It is well established that when a criminal defendant "neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence," his right against self-incrimination under the Fifth Amendment protects him from a compulsory examination by a hostile psychiatrist. . . . But when "a defendant presents evidence through a psychological expert who has examined him, the government likewise is permitted to use the only effective means of challenging that evidence: testimony from an expert who has also examined him." *Kansas v.*

> *Cheever*, 571 U.S. [at 94] . . . *In other words, by relying on the testimony of a mental-health expert who has examined him, the defendant waives his Fifth Amendment privilege.* Nonetheless, the scope of that waiver is "limited to the issue raised by the defense," and any testimony about the court-ordered psychiatric evaluation cannot go beyond this limited rebuttal purpose.

*Hernandez*, 750 F. App'x at 383 (emphasis added). The gravamen of the *Hernandez* court's analysis is that, following from *Cheever*, there is no Fifth Amendment bar against a compelled mental examination of the defendant if the defendant will rely on testimony of a mental health expert who has examined him, and the compelled examination will be limited to the issue(s) raised by the defense. *See also United States v. Maxton*, No. 13-cr-00411-PAB, 2014 U.S. Dist. LEXIS 197096, *1-2 (D. Colo. 2014) (relying on *Cheever* and Fed. R. Crim. P. 12.2(c) as authority for issuance of an order authorizing the government to conduct an examination of the defendant regarding the issue of defendant's claimed diminished capacity at the time of the alleged crimes, as indicated in the defense's Fed. R. Crim. P. 12.2(b) notice).

Both *Cheever* and the other cases cited above involved defense expert testimony to the effect that the defendant's mental condition negated his ability to form the *mens rea* required for conviction. However, federal courts have relied on the advisory committee notes to Fed. R. Crim. P. 12.2 as amended in 1983 to

conclude that a Rule 12.2(c) order compelling a mental examination in response to a Rule 12.2(b) notice is authorized even when the defense to be asserted through the defendant's expert pertains not to *mens rea* capacity, but to some other mental status that bears on guilt. *See, e.g.*, *United States v. Lewis*, 53 F.3d 29, 35 n.9 (4th Cir. 1995) (finding no error in district court order requiring Lewis to undergo a psychological examination in light of his notice that, as part of his entrapment defense, he intended to rely on expert testimony to show that he had a sub-normal level of intelligence); *United States v. Vega-Penarete*, 137 F.R.D. 233, 235 (E.D.N.C. 1991) (concluding that Fed. R. Crim. P. 12.2(c) encompasses order that defendant be examined by a government mental health expert to enable the government to respond to defense expert who examined defendant with respect to her Battered Wife Syndrome); *see also* Rule 12.2, Fed. R. Crim. P., advisory committee notes ("[E]xpert testimony about the defendant's mental condition may be tendered in a wide variety of circumstances well beyond . . . where a psychiatrist testifies for the defendant regarding his diminished capacity"; noting that the rule was expanded to cover, for example, the situation where the defendant gives notice of expert testimony by a psychologist bearing on the defense of entrapment).

In this case, the expert testimony appellant intended to offer was not to establish that he was incapable of forming the requisite *mens rea*, but instead was to show — in the trial court's words — "that [appellant's] mental abnormalities g[a]ve rise to mitigating circumstances [i.e., an actual if objectively unreasonable belief that he was in mortal danger, supporting a claim of imperfect self-defense] that reduce the level of guilt from murder to manslaughter." We see no reason why the rationale of *Cheever* and Rule 12.2(c) do not apply in this circumstance just as they do when a defendant seeks to establish that he could not form the requisite *mens rea* or that he acted in (perfect) self-defense and is entitled to acquittal. Expert testimony about a mental condition that reduces the level of guilt is testimony that "bear[s] on the issue of guilt[.]" Super. Ct. Crim. R. 12.2(b). Moreover, as the Supreme Court of Arizona reasoned in explaining why the trial court may compel a mental examination when the defendant wishes to use expert testimony for mitigation (of punishment) purposes rather than to prove lack of intent, "the same considerations apply in both contexts[,]" because "requiring a defendant to submit to a court-ordered mental examination often provides the only way to . . . ensure the state a meaningful opportunity to rebut the defendant's expert testimony." *Phillips v. Araneta*, 93 P.3d 480, 483 (Ariz. 2004); *see also id.* at 482 ("When a defendant places his mental condition at issue, . . . he generally

'opens the door' to an examination by an expert selected by the state or the court.").

Relying on *Cheever* and on the foregoing cases and authorities, we are satisfied that the proffered defense expert testimony fell within the scope of Rule 12.2 and that the instant case was, within the meaning of Super. Ct. Crim. R. 12.2(c)(1), an "appropriate case" for the trial court's issuance of an order compelling appellant to submit to a psychological examination by a government expert. As already described, appellant proposed to present expert testimony about his PTSD diagnosis, from a psychologist who had interviewed him over the course of several meetings and administered several diagnostic tests to him, in order to "corroborate the likelihood" that he subjectively believed his life was in imminent danger when he encountered and then stabbed Mr. Beasley.[9] The proposed

---

[9] The fact that appellant labeled his notice as a Rule 16 notice rather than a Rule 12.2(b) notice does not change our analysis. *Cf. Vega-Penarete*, 137 F.R.D. at 235-36 (reasoning that although the defendant did not give a timely notice under Fed. R. Crim. P. 12.2(b), the government "had early and sufficient notice of the defendant's intention to rely on evidence of Battered Wife Syndrome" (BWS) as a defense, and ordering that the defendant be examined by government's psychologist or psychiatrist as to her claimed BWS). Alternatively, if appellant's notice did not suffice as a Rule 12.2(b) notice, that circumstance triggered Super. Ct. Crim. R. 12.2(d)(1), which provides that for a defendant's failure to give notice under Rule 12.2(b), the trial court may exclude the defendant's expert evidence regarding a mental condition bearing on the defendant's guilt.

testimony, which put appellant's mental condition in issue, "b[ore] on the issue of guilt," R. 12.2(b), because it was intended to support a claim of (at least imperfect) self-defense. In light of the proposed testimony by the defense expert, an order permitting a government psychologist to examine appellant was not prohibited by the Fifth Amendment. The conclusion that this was an appropriate case is bolstered by the fact that the court made clear that it was imposing constraints on the government both because of defense counsel's proffer about the limitations the defense expert had observed in her interview of appellant[10] (the defense expert "did not ask anything about what happened during the incident of the case . . . and would not testify about it"), and in order to give effect to the limit stated in Rule 12.2(c)(2).[11] The court instructed that the government's expert interview of

---

[10] *Cf. United States v. Jackson*, No. 13-CR-000674-CAS, 2015 U.S. Dist. LEXIS 194201, *11 (C.D. Cal. 2015) (reasoning that "with regard to non-offense-specific mitigating factors such as a . . . long-standing mental condition, . . . allowing the government's experts to ask offense-specific questions" might "exceed the scope of what is necessary for the government's experts to rebut the defendant's mental condition evidence"); *United States v. Johnson*, 383 F. Supp. 2d 1145, 1163 (N.D. Iowa 2005) (reasoning that if defense psychiatrists obtained information from the defendant about the charged homicide, then "in fairness and justice the [State] should be permitted to cover the subject also").

[11] Rule 12.2(c)(2) states that "[n]o statement made by a defendant in the course of any examination conducted under this rule (whether conducted with or without the defendant's consent), no testimony by the expert based on the statement, and no other fruits of the statement may be admitted into evidence against the defendant in any criminal proceeding except on an issue regarding

(continued…)

appellant would be permitted "just for a limited purpose and the limited purpose is this diagnosis . . . ." The court also explained in plain terms how it would enforce that rule.[12]

D. *The trial court adequately considered the government's need for the compelled examination.*

Even when there is an "appropriate" case in the sense that there is no Fifth Amendment bar to a compelled mental examination, it does not follow that the government may examine the defendant in every case where the defendant proposes to present expert testimony on his mental state. Rule 12.2's language that a trial court "may" order an examination requires that the trial court exercise discretion in ordering such examination on a case-by-case basis, balancing the needs of the government to rebut the defense case with the liberty interests of the

---

(…continued)
mental condition on which the defendant has introduced evidence requiring notice under paragraphs (a) or (b) of this rule."

[12] The court told the prosecutors: "You think [the defendant is] going to make statements [to the government expert] that are somehow inconsistent with his claim of self-defense? The [g]overnment [is not] gonna be able to use those." The court continued: "The [g]overnment would say maybe we want to cross-examine about this, [and] I'm going to say, where did it come from[?] [If the answer is that it came from the government expert's] interview [of appellant,] I'm going to say no. And the [g]overnment's going to say, we got another source that it came from. I'm going to say convince me. If it's a close call, [the government] lose[s]."

individual defendant. *See Davis*, 93 F.2d at 1289 (noting loss of liberty by a commitment for examination and "forced intrusion of a court-order psychiatric examination"); *id.* at 1295 ("The proper parameters of the court's inherent authority can only be determined based on concrete cases or controversies, after development of the factual and legal issues at the district court level.").

Appellant insists that there was no demonstrated need for the examination by a government expert to rebut the proffered testimony of the defense expert and thus that the trial court did not exercise the necessary restraint in exercising its inherent authority to order a mental examination. Appellant asserts that a compelled mental examination cannot be justified on the ground that it "seems fair." On this record, we disagree with each of those points.

First, the government did offer a reason why an examination of appellant by a government expert was necessary for the government's trial preparation, and the trial court did find that the examination the government sought was necessary. The court asked the prosecutor why it was not enough to require the defense to make available its expert's data and to permit the government and its expert to interview the defense expert. The prosecutor responded that the defense expert would be able to base her opinion on appellant's demeanor during his meetings with her and

on her conversations with him and observations of him, while the government expert would not be able to test the defense expert's assessments and to form his or her own opinion based on conversations with and observations of appellant. Defense counsel interposed that the government expert would be able to "observe Mr. Bilal," to watch the defense expert's testimony, and to ask Dr. Rafanello about her observations. The court agreed that what defense counsel suggested would "not really [be] the same," reasoning that "the operative time is during the course of an examination" — i.e., "what [the expert] perceive[s] from what [the defendant] offers during that time, not when he's here [in the courtroom] in something of a controlled, yet maybe high-anxiety situation."[13]

The trial court also reasoned that:

> [The defense] expert has the first-hand knowledge and exchange with the gentleman and the documents, and the [g]overnment's expert seemingly testifies from a position where he or she simply cannot make that claim. And part of what the Government says is that doesn't seem fair from a trial context . . . when the jury hears about one expert with access and another expert without. And one

---

[13] Appellant argues that because Dr. Rafanello's testimony would be about appellant's prior diagnoses and evaluations and because the government would have access to the same records Dr. Rafanello reviewed, the government could have fully scrutinized "the validity of her opinion without a compelled examination." But appellant's Rule 12.2(b) disclosure stated that Dr. Rafanello's testimony would include the opinion that appellant "was suffering from [PTSD and complex trauma] at the time of the incident in this case."

> might reasonably suggest and conclude as a trier of fact, the expert with access has greater probative value than the expert without.

Although appellant offered not to cross examine the government expert on the basis that (s)he never examined appellant, the trial court determined that "both sides [should be] able to present evidence that comes . . . from the same source and the same basis[.]" The court's response was reasonable; even if cross-examination does not invite jurors to give less weight to the opinion of the expert who did not examine the defendant, we think jurors would be likely to do so of their own accord. *See also Cheever*, 571 U.S. at 94 n.2 (rejecting "Cheever's suggestion that the State could effectively have rebutted the testimony of his expert by introducing testimony from experts who had not personally examined him").

We are not persuaded by appellant's argument that more justification was needed for the court's ruling permitting the compelled examination. The defense's proposed expert testimony was central to the defense's argument that appellant acted in self-defense and was therefore not guilty of murder. The court's ruling was consistent with the Supreme Court's observation in *Cheever* that "[o]rdinarily the only effective rebuttal of psychiatric opinion testimony is contradictory opinion testimony; and for that purpose . . . 'the basic tool of psychiatric study remains the personal interview, which requires rapport between the interviewer and the

subject.'"  571 U.S. at 95 (quoting *United States v. Byers*, 740 F.2d 1104, 1114 (D.C. Cir. 1984) (en banc) (plurality opinion) (quoting *Rollerson v. United States*, 343 F.2d 269, 274 (D.C. Cir. 1964)).

Further, although the government had received the defense notice about the proposed expert testimony, it did not have a report from the defense expert, as none had been prepared.  In addition, during the June 3 hearing, when the court said that it could "right at this moment" set a time period for the defense to turn over Dr. Rafanello's data and other materials pertaining to appellant's claimed PTSD diagnosis, defense counsel asked the court to "hold off on that until the [c]ourt's ruling" on whether a government expert would be permitted to examine appellant.  The lack of a defense expert report and the defense position on the timing of disclosure of Dr. Rafanello's data and materials may have hampered the prosecutors' ability to explain more fully why the government could not rely solely on access to the defense expert's materials and why an examination of appellant was necessary to meet the position of the defense, and may also have hampered the court's ability to assess the government's need to have its expert examine appellant.  For these reasons, we cannot conclude that the trial court erroneously exercised its discretion in not requiring a more detailed showing from the government about why it needed to have its expert examine appellant.  *Cf. United*

*States v. Baugus*, 137 F. App'x 962, 964 (9th Cir. 2005) ("The district judge has broad discretion under Federal Rule of Criminal Procedure 12.2 to order a mental examination.").

    E. *Fairness to the government was a valid consideration.*

We also reject appellant's argument that the trial court erroneously exercised its discretion by basing its ruling on fairness. The Supreme Court endorsed that approach in *Cheever*, explaining that "[a]ny other rule would undermine the adversarial process, allowing a defendant to provide the jury, through an expert operating as proxy, with a one-sided and potentially inaccurate view of his mental state at the time of the alleged crime." 571 U.S. at 94. Other courts have likewise resolved the issue of whether to order a compelled examination by a government expert on the basis of fairness. *See, e.g.*, *United States v. Gonzales*, No. CR18-5489 BHS, 2020 U.S. Dist. LEXIS 24663, at *9 (W.D. Wash. Feb. 12, 2020) "[G]ranting the request for [a compelled psychological] evaluation [of the defendant's claimed cognitive limitations and autism spectrum disorder] is appropriate as a matter of fundamental fairness[.]"); *Jackson*, 2015 U.S. Dist. LEXIS 194201 at *5 (concluding, in a case in which defendant Jackson gave notice of his intent to call a psychologist to testify about his PTSD to support the

inference that he could not have formed the requisite *mens rea* at the time of the charged offenses, that the psychologist's "personal interactions with Jackson have likely shaped some of her impressions and conclusions," and therefore that "the government should have an equal opportunity to evaluate Jackson as a matter of fairness and in the interests of justice"). The trial court here did not abuse its discretion in rendering its ruling on the basis that to preclude the government from having its expert examine appellant would not "make sense . . . from a fairness standpoint."

For the foregoing reasons, the judgment of the Superior Court is

*Affirmed.*

RUIZ, *Senior Judge*, concurring: I join the majority's conclusion that in this case there was no Fifth Amendment bar to a compelled mental examination because the defendant had waived its assertion by proposing to present expert evidence based on a mental examination. With this waiver, the trial court had discretion to order an examination by a government expert. I also concur that the trial court properly exercised its discretion to order an examination in this case,

with appropriate limitations on its use by the government at trial, where the defense to the most serious offense was premised on appellant's perception that he was acting in self-defense, which depended heavily on expert testimony that he suffered from PTSD based on a personal examination of appellant.

I write separately to emphasize that this is a discretionary call for the trial court that requires careful weighing of different interests. Inherent authority, as the majority opinion cautions, is to be exercised "with restraint" and in accordance with the "relevant procedural rule (here, Rule 12.2)." *Ante* at 14. We interpret Rule 12.2(c)'s reference to an "appropriate" case as referring to the Fifth Amendment and, in light of *Cheever's* reasoning, a defendant waives a Fifth Amendment claim by proposing to call a defense expert who will testify based on a personal examination. This means, in the words of Rule 12.2(c), that the trial court "may" — not that it shall — order a mental examination in such a case.[1] In exercising that discretion, the trial court must bear in mind that a compelled mental examination is never to be imposed lightly. See *United States v. Davis*, 93 F.3d 1286, 89 (6th Cir. 1996) (noting it presents "serious — and as yet undecided — constitutional questions"). A compelled mental examination intrudes upon

---

[1] Rule 12.2(c)(4) also bars admission of statements made by the defendant during examination, expert testimony based on such statements and other fruits of the defendant's statements.

important individual rights and possibly could pose risks to the health of a fragile defendant. It has the potential to intimidate a defendant who suffers from a mental condition and, as a consequence, impinge on the Sixth Amendment right to present a defense and call witnesses. Thus, although fairness to the government can be a relevant factor to take into account in the exercise of the court's discretion in a given case, care must be taken that it is not to be "double counted" (once used to effect waiver of the Fifth Amendment) by automatically invoking it as a shortcut that avoids a proper balancing of interests. Not every case in which the defense expert has examined the defendant will justify that the trial court order that the defendant submit to a compelled government mental examination. For example, one can envision cases where evidence of the defendant's mental condition is sufficiently established that a compelled mental examination is not warranted or outweighed by the intrusion of a compelled mental examination; where the proffered defense expert's opinion and testimony can be adequately probed at trial by government counsel or a government expert without need for a compelled personal examination of the defendant; where the defense expert's evidence is not pivotal to the jury's decision in the case; where the prosecution might be able to observe the defense expert's examination and, possibly, even collaborate in its design so that the government's purposes can be met without need for an additional, separate examination; or where the defendant's condition is such that

his health and well-being would be significantly affected by an additional, compelled examination. These are simply examples. The principal point is that compelling a mental examination should not proceed automatically as a reflexive nod to adversarial tit-for-tat whenever the defense proposes to present testimony based on a mental examination, but should be the product of a deliberate and careful analysis of the relevant interests at stake.